# HAGAN v. CONTINENTAL NATIONAL BANK, Appellant.

### In Banc, June 2, 1904.

1. **PLEDGE: Appropriation by Pledgee: Remedy: Equity.** The petition alleges that certificates of stock belonging to plaintiff had been pledged to defendant as security for the payment of a debt, that such certificates constituted a majority of the stock of a certain opera house, and gave to the holder necessarily the power to control the management of the company's business, and that the pledgee had by a fraudulent, unfair and pretended sale bought the same in its own name and caused the same to be transferred on the books of the company in the names of other parties, but that such transfers were so made that defendant still controls and can produce the same, and prays that plaintiff be allowed to redeem the same by paying into court the debt, and for general relief; and the answer denied that it had caused a transfer of the stock. *Held*, that the bill necessarily calls for an accounting and discovery, and the pleading stated a case falling under the head of equity jurisprudence, and plaintiff is not shut up to an action at law for conversion, or for money had and received.

2. ———: ———: **Sale: Subsequent Claim of Ownership.** Where the pledgee has unfairly sold the pledged property and bought it in and afterwards claims title thereunder and sells it to a third party, it is necessary for a court of equity to decree the sale invalid in order that the pledgor may require the pledgee to account to him for the proceeds of the subsequent sale, and hence the pledgor's remedy is not to be found in an action at law.

3. ———: **Sale: Rights of Pledgor.** Although the pledgee may have the express authority to sell the property pledged by public or private sale, the pledgor is entitled to a fair sale, and the sale must be so made as not to sacrifice the securities, and if the pledgee unfairly or unnecessarily prejudices the rights of the pledgor the sale will be set aside.

4. ———: **Public Sale: Public Place: Notice.** The pledge conferred on the pledgee the power to sell the certificates of stock pledged to a bank as security for the payment of notes, at public or private sale, and no notice whatever was given to any one except the interested parties that the sale was to be made, but

at a certain hour the broker, employed for the purpose, mounted a platform in the stock exchange and announced: "We will offer for sale, for cash, to the highest bidder, for the account of whom it may concern, 770 shares of the Hagan Opera House stock, par value $100 per share," and there being only one bidder, the cashier of the bank, they were sold to him for $5,000. *Held*, that this was an unreasonable and unfair exercise of the power conferred to sell at public sale: first, because a ruthless sacrifice of the stock; second, because it was not made at a public place, since the exchange was accessible to its members only, only members being allowed to buy and sell on its floors; and, third, there was no notice to the public of the pretended public sale.

5. ———: **Invalid Public Sale: Subsequent Private Sale.** Where the pledgee is given the power to sell the pledged property at public or private sale, and undertakes to sell it at a public sale and buys in the property, which sale is invalid because unfair, and subsequently sells the property at a private sale, although claiming to be the owner, the private sale will be held to be a sale under the trust imposed by the pledge, if the purchaser is an innocent purchaser without notice, and equity will compel the pledgee to account for the proceeds in excess of the debt.

6. ———: **Prayer to Redeem: Relief: Accounting.** Where the court finds itself unable to permit the pledgor to redeem the property unfairly sold at private sale, it will, under the prayer for general relief, require the pledgee to account for the amount of money for which he sold the property, and deduct the amount of the debt, and give the pledgor judgment for the balance.

7. ———: **Sale on Credit: Value: Accounting.** Where the pledgee sells the pledged property and takes the notes of the purchaser in payment thereof, the pledgee will not be heard to say that the sale was speculative, but the principal of the notes is the value of the property sold.

8. ———: ———: ———: **Determined by Jury.** In an equity case, neither party is entitled to a jury to determine the value of the property taken into the accounting. Where a court of equity acquires jurisdiction over a cause for one purpose it is competent to dispose of any and every issue.

9. ———: **Prayer to Redeem: Money Judgment: Pleading.** An equity court has power to render a money judgment in a case where its inability to compel a return of specific property results from the misconduct of the defendant, which was unknown to plaintiff at the time he brought the suit.

Hagan v. Bank.

10. ——: ——: **Tender.** In a suit to redeem property pledged as security for a debt, a court of equity will not deny plaintiff an accounting and a money judgment upon a showing that the property has passed into the hands of an innocent purchaser, because, forsooth, he did not first pursue the idle ceremony of tendering the amount of his debt.

Appeal from St. Louis City Circuit Court.—*Hon. S. P. Spencer,* Judge.

AFFIRMED.

*Boyle, Priest & Lehmann* for appellant.

(1) The bill does not state facts that would entitle plaintiff to any equitable relief. A court of equity has no jurisdiction to set aside sales of personal property made under a pledge, unless some such equitable ground as injunction, specific transfer, discovery or accounting is laid. No such ground is laid in the bill. 2 Story's Eq. (Redfield's Ed.), sec. 1032; Schouler's Bailments & Carrier (3 Ed.), 258; Durant v. Einstein, 35 How. Pr. 231; Lewis v. Varnum, 12 Abb. Pr. 308; Rowland v. Bank, 135 Pa. St. 598; s. c., 19 Atl. 951; Ambrose v. Evans, 66 Cal. 74, 4 Pac. 960; Greer v. Bank, 128 Mo. 559; Hewitt v. Steele, 118 Mo. 463; Richardson v. Ashby, 132 Mo. 238; Lacombe v. Forstall, 123 U. S. 570; Jones on Pledges, secs. 556, 557, 558 and 559; 2 Cook on Corp. (4 Ed.), sec. 475, note 2; Nelson v. Owen, 113 Ala. 372, 21 So. 75; Ins. Co. v. Dalrymple, 25 Md. 242; s. c., 89 Am. Dec. 789; Flowers v. Sproule, 2 A. K. Marsh. (Ky.) 54; Bryson v. Rayner, 25 Md. 424, 90 Am. Dec. 90; 22 Am. and Eng. Ency. of Law (2 Ed.), pp. 877 and 878. The reason is, the plaintiff has an adequate remedy at law. (2) The decree was not predicated upon any of the allegations of the bill, nor upon any issue made by the pleadings, and is therefore erroneous. It was charged in the bill, and admitted by the answer, that the defendant had and could produce the certificates

of shares in contest.   The sale (if we may call it a sale, though in fact only a method adopted by the defendant as a mode of working out to the best advantage whatever of value there was of this peculiar stock, which had no salable or market value, and which defendant could not work out for itself) to Jannopoulo was not adverted to in the bill, and was only brought out under a pretext of showing an admitted fact, and admitted under an erroneous ruling that it was competent as showing the value of the stock at the time of the previous sale at the Merchants Exchange, and could not be made the basis of the decree.   Duncan v. Fisher, 18 Mo. 404; Irwin v. Childs, 28 Mo. 570; Mead v. Knox, 12 Mo. 287; Harris v. Railroad, 37 Mo. 310; Newham v. Kenton, 79 Mo. 382; Christian v. Ins. Co., 143 Mo. 496; Dougherty v. Adkins, 81 Mo. 411; 1 Beach Mod. Eq., sec. 99; Wilson v. Cobb, 28 N. J. Eq. 177; Howell v. Sebring, 14 N. J. Eq. 84; Stevens v. Church, 41 Conn. 370; Doggett v. Sims, 4 S. E. 909; Gorham v. Parsons, 119 Ill. 425; Midmer v. Midmer, 26 N. J. Eq. 299; Francis v. Bertrand, 26 N. J. Eq. 213; Kelly v. Kelly, 54 Mich. 30; s. c., 19 N. W. 580; Hunter v. Hunter, 10 W. Va. 264; Elyton, etc., Co. v. Iron City, etc., Works, 20 So. 51; Skimer v. Bailey, 7 Conn. 496; Edwards v. Brightly, 12 Atl. 91; Hawes v. Dobbs, 137 N. Y. 465; s. c., 33 N. E. 560.   (3) Again, if a party brings an equitable action, he must maintain it upon some equitable ground.   If the matter is one of legal jurisdiction, in order to maintain a bill for equitable relief he must state facts in the bill which clearly show that a judgment at law will not afford him an adequate remedy.   If the plaintiff failed to make out a case of equitable cognizance in his bill, he was not entitled to any judgment at law merely because the same court administered both legal and equitable remedies. Damages only can not be awarded in an action seeking for equitable relief.   R. S. 1899, secs. 691, 692; Bradley v. Aldrich, 40 N. Y. 540; s. c., 100 Am. Dec. 528; Heywood v. Buffalo, 14 N. Y. 540; Wheelock v. Lee, 74 N. Y.

495; Scott v. Billgerry, 40 Miss. 119; Sims v. McEwan, 27 Ala. 184; Dougherty v. Adkins, 81 Mo. 411; Bank v. Poynts, 60 Mo. 531; Gupton v. Gupton, 47 Mo. 37; Story's Eq. Jur., sec. 799. (4) If the plaintiff could recover under his bill damages alone, the finding and judgment is erroneous. His measure of damages was the value of the shares of the stock at the time he tendered payment and demanded the return of his stock. Greer v. Bank, 128 Mo. 559; Galigher v. Jones, 129 U. S. 193; Richardson v. Ashby, 132 Mo. 238; Chouteau v. Allen, 70 Mo. 290.

*Robert L. McLaran* and *Hiram J. Grover* for respondent.

Upon the facts presented by the record, under the last controlling decision of this court, the sale of Hagan's stock by the Continental National Bank on the Merchants Exchange, was null and void. Bank v. Richardson, Admr., 56 S. W. 1117. (1) A pledgee of collateral securities is a trustee, and in dealing with the property pledged is subject to the same limitations and restrictions as are imposed upon any other trustee in disposing of trust property. Colebrooke, Col. Sec. (1 Ed.), secs. 87, 117, 132; Stokes v. Frazier, 72 Ill. 433; Joliet, etc., v. Scioto, etc., 82 Ill. 548; 2 Perry on Trusts, secs. 602b, 602gg; Ins. Co. v. Dalrymple, 25 Md. 265; Story, Eq. Jur., 321, 322, 323; Bank v. Richardson, Admr., 56 S. W. 1117. If there is a written contract or pledge, giving the pledgee the right, upon the pledgor's default, to dispose of the property pledged, then the pledgee acts as a trustee vested with a power, and is subject to all rules pertaining to the execution of powers. He is subject also to all rules prescribing what trustees shall and shall not do with regard to trust property. Under any and all circumstances the pledgee must pursue such reasonable, honest and fair means as will insure the procurement of the best possible price for the property

under that method. Colebrooke, Collateral Security, sec. 118; Jones on Pledges, secs. 610 and 636; 2 Perry on Trusts, secs. 602o, 782; Chesley v Chesley, 49 Mo. 542; Cassidy v. Wallace, 102 Mo. 581; Harlin v. Nation, 126 Mo. 54. (2) A public sale can only be made in a public place after notice to the public. It was the duty of the bank, ostensibly making a public sale, to give notice of the sale to the public. 2 Perry on Trusts, secs. 602o; 782; Colebrooke, Col. Sec. (1 Ed.), sec. 121; Porter v. Graves, 104 U. S. 174; Routt v. Milner, 57 Mo. App. 54. A notice to the public, when given, must state the name of the pledgor, the name of the pledgee, and the name of the party exercising the power of sale. The notice must also state that the sale is being made in the execution of the power, and the power must be stated with such definiteness that the public may be able to judge of its sufficiency, inasmuch as purchasers at such auction make bids at their own peril. 2 Perry on Trusts, secs. 602g, 602q; Bank v. Richardson, Admr., 56 S. W. 1117. (3) Hagan had a right to be present at the sale. It was gross wrong on the part of the pledgee to deprive Hagan of this right by having the sale made at a place where Hagan could not be present. He was not a member of the Merchants' Exchange. Colebrooke, Collateral Security (1 Ed.), secs. 123, 331; 18 Am. and Eng. Ency. Law (1 Ed.), pp. 670, 671, and note to 672; Jones on Pledges, 610. (4) The court held that the sale to Jannopoulo, on June 29, for $30,000, was a valid execution of the power of sale, and sufficient to convey the stock to Jannopoulo. The sale to Jannopoulo being a valid execution of the power, and in conformity to the contract, did not constitute a conversion by the bank, nor a breach of the contract, and did not give rise to an action in trover or for conversion, or for damages for breach of contract. On the other hand, the $30,000 received from the stock belongs to Hagan subject to the bank's claim of $23,340, and as the bank refused to account to

Hagan for the money, equity would state the account and administer complete justice between the parties.

*Henry W. Bond* also for respondent.

(1) The pledgee is under the duty to exercise the utmost good faith in all his dealings with the pledge and the pledgor. Bank v. Richardson, 156 Mo. 270; Greer v. Bank, 128 Mo 559; Chouteau v. Allen, 70 Mo. 335; Schaaf v. Fries, 90 Mo. App. 111. (2) Upon violation of any of such duties the remedy of the pledgor is either by action at law or in equity, according to the peculiar facts of each case, and the peculiar redress sought. No tender required where contract is denied. Stephenson v. Kilpatrick, 166 Mo. 262. (3) The rule distinguishing the cases in which legal and equitable remedies may be resorted to is thus stated by the text writers and the decisions: "If the stock contracted to be sold is easily obtained in the market, and there are no particular reasons why the vendee should have the particular stock contracted for, he is left to his action for damages. But where the value of the stock is not easily ascertainable, or the stock is not to be obtained readily elsewhere, or there is some particular and reasonable cause for the vendee's requiring the stock contracted for to be delivered, a court of equity will decree specific performance and compel the vendee to deliver the stock." Cook on Corporations (4 Ed.), sec. 338; Jones on Pledges (2 Ed.), secs. 557, 577a; O'Neill v. Webb, 78 Mo. App. 1; Colburn v. Riley, 11 Colo. App. 184; Kraus v. Woodward, 110 Cal. 638; Realty Co. v. Iron Co., 50 N. H. 57; Merrill v. Houghton, 51 N. H. 61; Brown v. Runalls, 14 Wis. 693; Johnson v. Brock, 93 N. Y. 337; Hart v. Ten Eyck, 2 Johns. Chy. (N. Y.) 100; Adams v. Messinger, 147 Mass. 185; Bryson v. Rayner, 25 Md. 424; s. c., 29 Ind. 473; Jones v. Smith, 2 Ves. Jr. 372. (4) When the impossibility of a specific performance is disclosed at the hearing, and the suit was brought by the plaintiff in

ignorance of such fact, the court will award the remedy of damages. 3 Pomeroy on Eq. Jurisprudence (2 Ed.), sec. 1410; cited and approved in Ryan v. Dunlap, 111 Mo. 620; Hamilton v. Hamilton, 59 Mo. 232. (5) There is abundant evidence in the record showing that the actual value of the block of stock (770 shares) sought to be recovered by plaintiff exceeded largely the amount for which the court by its decree held the defendant accountable. (6) Justice demands a more liberal construction of a petition after answer and verdict, than when its sufficiency is challenged by demurrer or motion. Cobb v. Railroad, 149 Mo. 135.

GANTT, J.—In 1891 the Hagan Opera House Company was organized as a corporation under the laws of this State with a capital stock of 1,000 shares of the par value of $100 each and aggregating $100,000.

On this capital stock $83,000 was at once paid in. A long term lease was secured by the corporation on a lot of ground at the corner of Tenth and Pine street, in St. Louis, having a front of one hundred and twenty-five feet on Pine street. A building was constructed in which there were stores and offices on the ground floor fronts, and also on the upper floors, and a large theatre in the central back portion. This building and the equipment of the theatre cost $156,000. After the completion of the building, the capital stock of the corporation was increased to 1,500 shares, that is to say to $150,000. Of these 1,500 shares, Hagan held 770 shares, a clear majority, which gave him the control of the corporation and all of its financial affairs. As is usual with the holder of the majority of shares in corporations, Hagan elected a board of directors, which latter elected him president, with a salary.

The corporation made a profit from its rents and from its theatrical department conducted along the line of the "legitimate" show prior to the theatrical season of 1896-1897. The "continuous show" craze had reached

St. Louis, and had had a profitable run. Some of the stockholders in the Hagan Opera House thought the "legitimate" show too slow, that it did not earn money fast enough, and after bookings had been made on old lines for the season, these stockholders insisted upon their abandonment and upon a resort to the "continuous." Hagan and Havlin unwillingly yielded to the pressure, and the character of the entertainment offered to the public was changed, December, 1896. It turned out, however, that the "continuous" show business was on the wane, at least in first-class theatres, and the corporation, instead of making its profits and dividends, made a loss on the season of $2,700, and there was a temporary cessation of income to the stockholders.

Hagan had been a customer of the Continental National Bank for some years prior to this. At various times the bank had loaned him money, as much as $40,000 at one time, and as security for the loan, Hagan had pledged to the bank his 770 shares of stock of the Hagan Opera House Company, accompanied by a collateral contract in which there was embodied a "power" as follows:

"Now, in the event of non-payment of said note when due, or of non-payment at maturity of any other note or claim held by said bank against the maker of the above note . . . the said Continental National Bank, by its officers or agents, is hereby invested with full power and authority to use, transfer, hypothecate, sell and convey the said property, or any part thereof, at public or private sale, with or without notice to me or us, at such place and on such terms as it may deem best, and to deliver the property sold, and to transfer on the books of the company the stocks named to the purchaser or purchasers of the same. The bank shall also have power at such sale to bid for and purchase said property, or any part thereof, in its own name and for its own use and benefit. . . ."

Sometime previous to 1897 Hagan had also deliv-

ered to the bank some second deeds of trust on real property, and some shares of stock in an Underground Service Company.

Prior to the first of January, 1897, Hagan had reduced his indebtedness from $40,000 to a sum exceeding a little over $23,000. This indebtedness was represented by a single note, executed by Hagan, for $15,340, and the balance of the $23,000 was represented by two notes, made by Hagan, indorsed by Havlin, approximating in the aggregate $6,500, and by another note for $1,500. The interest was all paid up.    As the season progressed under the new form of entertainment, the bank appeared to become uneasy about its security, and in March, 1897, began to press Hagan to reduce his indebtedness.    It did not demand of him the payment of all of it.    On March 4, 1897, the bank addressed a letter to Hagan, renewing his note for $15,340, which matured that day, but stated to him that the renewal was made upon the express condition that another note of Hagan's for $1,500 indorsed by Havlin, which would become due on March 10, 1897, should be paid at maturity, and that the bank would require that Havlin note to be paid when due.

On March 17, 1897, the bank wrote another letter to Hagan, calling his attention to an overdraft, and to the past due Havlin note of $1,500, and telling him he must pay both of them.    On March 29, the bank sent another letter to Hagan, calling his attention again to the overdraft and to the fact that the $1,500 Havlin note still remained unpaid.    This letter contained the first threat made by the bank—for they notified him that unless this matter, the overdraft and the Havlin $1,500 note, were not attended to immediately the bank would put Hagan's affairs in a broker's hands, as Baker said, "and see if I can not get this matter attended to, as we are unwilling to carry overdrafts for anyone."    The bank also notified him if the Havlin note was not attended to they would take steps to collect it at law.    All

those letters are found in the record.    On May 12, 1897,
the bank wrote to Hagan that it had received an intima-
tion that he had sold his property, presumably the stock,
and asking information on that subject.    The letter pro-
ceeded to state, ''We are still holding a $1,500 note of
yours past due, indorsed by Havlin, which I have noti-
fied your attorney must have attention.''  The reference
to Hagan's rumored disposition of his property seems to
have arisen out of some hint received by the bank of
Jannopoulo's offer of $50,000 to Hagan for his stock.

The first demand made by the bank for the payment
of the $15,340, for which the 770 shares of stock were
pledged, was made June 10, 1897, at which time the
bank formally demanded payment not only of this large
note, but of a $1,500 note, and a $5,000 and a $1,500 note
indorsed by Havlin.    Pressed to pay his indebtedness
Hagan employed Bauer, a broker, to see what could be
done with his stock in St. Louis, which resulted in Jan-
nopoulo's offering $50,000 for Hagan's 770 shares, pro-
vided the bank would take his notes for the amount of
Hagan's indebtedness, and take the stock as collateral,
and he would give Hagan his notes for the remainder of
the $50,000 and secure him by a second lien on the stock.

This proposition came to the knowledge of the bank
prior to June 10, 1897.    It seems the bank was willing
to make this arrangement, but Hagan declined it, be-
cause it brought him no cash, and because he would thus
lose all his voice in the control of the theatre while his
money was invested in it.

Mr. Baker, the president, says that he personally
notified Hagan that his stock would be sold at public
sale.    The answer of the bank in this case alleges that
this stock was sold at *public* sale, and it is clear that the
bank intended, after the demand of June 10, 1897, to
give Hagan notice that his stock would be sold at *public*
sale.    The bank followed the demand of June 10, 1897,
with the letter dated the twelfth of June, giving Hagan
a notice that his stock would be sold on the Merchants

Exchange, on June 18, between the hours of 12 and 1 o'clock.

Hagan testified that this action of the bank was entirely unexpected, and greatly shocked him.

In the few days accorded him he endeavored to find a purchaser and among others applied to Mr. Scullin for assistance. Scullin went with him to the bank and said to Mr. Baker that he wanted a week or ten days to look into the matter. Mr. Baker referred it to his board, and they granted an extension from the eighteenth to the twenty-second of June. Within that time Mr. Scullin said that he could do nothing. Whether it was because he had not sufficient time, or for some other reason, does not appear. A few moments before 12 o'clock on June 22, 1897, Hagan called at the bank and pleaded with Mr. Baker to postpone the sale and give him a chance to turn around, but Mr. Baker refused, and while he was yet there, Mr. Marshall, the cashier, took the papers and started to the Exchange.

The Merchants Exchange is accessible to its own members only. Only members are allowed to buy and sell on its floors. Hagan was not a member, and could not be and was not present at the sale of his stock, nor could any other citizen who was not a member.

Although Mr. Baker testifies that he had told Hagan the stock would be sold at *public* sale, no notice whatever was given to the public that the stock would be sold —either at the sale announced for the eighteenth of June, or at the sale for the twenty-second of June.

Baker says there was no advertisement whatever informing the public that the stock would be sold, or announcing the terms of the sale, or the authority by which the sale would be made. In fact there was no attempt by the bank to advertise the sale, or to give public notice of it.

Baker says further that he did not himself personally notify anyone that the sale was to be made. Marshall says he did not notify anybody that the sale was to

be made. The only persons who knew that a sale was to be made, down to the very moment of the sale, were Baker, Marshall, Hagan, Scullin, and Wernse, the broker whom Marshall called upon on his way from the bank to the Exchange, and asked to come and do the auctioneering at 12 o'clock. Marshall was on the floor of the Exchange for some time before 12 o'clock with Hagan's stock and notes, but did not inform a single person there that the sale was to take place. Neither did Wernse, after he arrived there, go around and inform a single member of the Exchange that the sale was to be made. Wernse mounted a little rostrum or platform on the floor of the Exchange and gave out the first information that the 770 shares of the stock of the Hagan Opera House Company was to be there immediately sold. His announcement was as follows:

"The Court: Just give the announcement you made that day.

"A. 'We will offer for sale, for cash, to the highest bidder, for the account of whom it may concern, 770 shares of the Hagan Opera House stock, par value $100 per share.' I also announced that unless I knew the bidder to be a responsible party I would require $2,500 or $5,000 in cash or certified check immediately on the bid being closed. I also announced, I may say here, that if anyone desired (this is the customary announcement) to have small lots put up, that I would put it up in ten share lots, or any multiple that might be desired.

"Q. Now, was that the announcement you made in this case? A. Yes, sir.

"Q. And that was all the announcement, you didn't make any further announcement in this particular case? A. No, sir; I believe not.

"Q. Did you state specifically who was the owner of this stock? A. No, sir; I didn't know who was the owner.

"Q. Did you state specifically to whom the stock had been pledged? A. No, sir.

"Q. Did you state specifically by what authority you were selling? A. No, sir; by the way, I never did that yet, in all my sales."

Mr. Marshall, the cashier of the bank, was the only bidder and he bid $5,000 for the stock and it was knocked down to him. The bank prior to the alleged sale had a claim against Hagan for $23,340. For this it had as collateral security 770 shares of the stock of the Hagan Opera House Company. It had Havlin as an indorser for $6,500 of that amount. It also had some second deeds of trust and some shares of Underground Service Company stock. After the sale of Hagan's stock it had on hand to represent this debt of $23,000 the following:

1. A claim against Hagan on his note for about
...... ...... ........ .... ...........:.....$17,000
2. Jannopoulo's note for ...................  30,000
                                             —————
                                             $47,000

SECURITY.

1. It had the same stock in its possession......$77,000
2. It had Havlin's indorsement for...........  6,500
                                             —————
                                             $83,500
3. The second deeds of trust and the Underground Service Stock.

The bank took the position that this was a bona fide sale, and that it broke down the contract of bailment and terminated Hagan's relation to the stock. It marked the $1,500 note paid, and the balance of its bid, less Wernse's commission, amounting to about $3,400, it credited on Hagan's note for $15,340. It claimed then to own the stock divested of Hagan's interest, and as such owner, in a few days sold the stock for $30,000 to the same Jannopoulo who, the bank knew, had shortly before offered Hagan $50,000 for it. It denied that Hagan was entitled to any portion of the $30,000. It never credited any part of it on any of his notes; but claimed that the whole $30,000 belonged to the bank.

After the sale McLaran, Hagan's attorney, saw a notice of the sale in the early afternoon papers of the twenty-second of June. He called at the bank the same afternoon. McLaran thinks he saw Baker that afternoon, but he is certain that he saw him next day. There is no dispute as to what passed between them. McLaran told Baker that if the sale had been made on the Merchants Exchange, and in the manner and under the circumstances, and under the requirements reported to him, the sale was illegal and could not stand. He asked Baker to set aside the sale, and allow Hagan to redeem the stock. Baker refused the request. In refusing the request, he declared that the sale was bona fide and valid, and that the bank would stand by it. That Hagan had no further interest in the stock, and the bank refused to recognize him as having any interest in it. The stock belonged to the bank absolutely as its own property, and the bank would sell the stock for its own use and benefit to whom it pleased, without any further reference to Hagan or his wishes. McLaran said then he would have to bring a suit to set aside the sale, and left.

Before filing the suit, McLaran called again upon Baker and told him that he had drawn the papers for the suit, and asked him again if he would recognize Hagan's interest in the stock. Baker said he refused to recognize Hagan's equity or rights in the property and would stand by the sale. Baker says he remembers this last call of McLaran's, and when McLaran told him that he was going to bring suit, Baker said "fire away."

The proofs as to the value of the stock satisfactorily established that there was no market value as such. It had never been on the market.

As to the actual value, Hagan testified that in his opinion the 770 shares were worth $60,000. On the other hand the bank insists the stock was only worth $5,000.

The stock represented in part a building that cost $156,000 located in the central portion of the city of St. Louis, and held by a long lease at a ground rent. The testimony tended to show that the net rental value of the theatre was.....................$   15,000
and of the remainder of the building....     8,400
                                         $   23,400

Against which were the following fixed charges:

Ground rent ............. ........ .........$ 6,750
Taxes ................... ............. .... ...   2,400
Insurance ........................... ...........   1,700
Interest on $20,000 deed of trust...............   1,200
                                         $12,050

or a balance of $11,350 over and above fixed charges.

The bank sold it for $30,000. Other evidence may be noted in the course of the opinion.

On the hearing the court found that the sale on the floor of the Exchange could not be sustained on account of the clearly inadequate price obtained for the stock, the defendant being the sole and only bidder, and by reason of the other circumstances attending the sale, the relation of the bank to the stock was the same after that sale as before it was made. The court further held that the subsequent sale to Jannopoulo was bona fide and within the power granted to the bank to sell at private sale, and that there could, therefore, be no redemption from the purchaser at said second sale, and as Jannopoulo was not a party to this suit he could not be affected by this suit. The court further held that as the stock had been sold to Jannopoulo and hence could not be redeemed the failure of plaintiff to tender the amount of the note and interest would not bar any equitable relief which the pleadings and evidence would justify. It thereupon set aside the sale on the Merchants Exchange, and decreed an accounting, and required an accounting as to the amount due the bank, and required any excess

to be paid over to the plaintiff, pledgor of the stock, and in its decree ascertained that excess to be $6,796.85, and awarded plaintiff judgment for that sum and costs with execution therefor.

From that decree defendant prosecutes this appeal.

I.   It is insisted that plaintiff's remedy, if any, is by an action at law for conversion, or for money had and received.   We are referred to the statement in Jones on Pledges (2 Ed.), sec. 556, to the effect that "in general, a bill in equity does not lie to redeem property from a pledgee, because the remedy at law upon a tender of money is ample; the remedy at law being either a possessory action to recover the thing pledged or an action of trover to recover its value.   A special ground for proceeding in equity must be shown, as that a discovery is necessary *or that an account is wanted,* or that there has been an assignment of the pledge."   Counsel for defendant argue that the facts disclosed in the record do not bring it within any recognized head of equity jurisdiction.

The author of the statement above cited obviously did not attempt in that excerpt to exhaust the various heads of equity which would authorize a court of equity to grant relief to a pledgor of a chattel.   The rule distinguishing the cases in which legal and equitable remedies may be resorted to is stated both by the courts of last resort and by the text-writers.

"If the stock contracted to be sold is easily obtained in the market and there are no particular reasons why the vendee should have the particular stock contracted for he is left to his damages.   But where the value of the stock is not easily ascertainable, or the stock is not to be readily marketable elsewhere or there is some particular and reasonable cause for the vendee's requiring the stock contracted for to be delivered, a court of equity will decree specific performance and compel the vendor to deliver the stock."   Thus, where the value of the stock is not easily ascertainable, as in this case, where

it had no market value and where plaintiff's holding carried with it the management of the opera house, and gave him a controlling voice in the business.

Jones on Pledges and Collateral Securities (2 Ed.), section 558, asserts that, "Where the property pledged is stock in a corporation, and the shares have been transferred upon the books of the company to the name of the pledgee so that he has the legal title, equity alone can restore possession of the shares to the pledgor, by an order for redelivery. The transaction is a pledge, although the legal title passes to the pledgee; but it partakes of the nature of a mortgage, and it would seem that the remedy for redemption should be the same as upon mortgages."

In Railroad v. Iron Co., 50 N. H. 57, the defendants insisted as here that plaintiffs had a plain and adequate remedy at law to maintain trover after an improper sale by pledgees, but the Supreme Court answered, "But the existence of a legal remedy is not necessarily decisive against equitable jurisdiction; and, in the present case, a bill in equity may be maintained. However the rule may be in ordinary cases of pledge, there is authority for sustaining a bill to redeem where an account is wanted, or where there has been an assignment of the pledge." [Story on Eq., sec. 1032; Hasbrouck v. Vandervoort, 4 Sand. Super. Court 74; Kemp v. Westbrook, 1 Vesey, Sr. 278; Hart v. Ten Eyck, 2 Johns. Chy. 62.]

In Colorado the jurisdiction in equity is firmly maintained. [Colburn v. Riley, 11 Colo. App. 184; Dunne v. Stotesbury, 16 Colo. 91.] See, also, Johnson v. Brooks, 93 N. Y. 337; Adams v. Messinger, 147 Mass. 185.

Nowhere is the law more tersely stated than in Bryson v. Rayner, 25 Md. loc. cit. 433, wherein it is said:

"Although a pledge is not technically a mortgage, the subject of it not having been assigned or transferred by an instrument known to the law as such, with condition of defeasance, yet it is given in certain cases, as

in this, as a security for debt, and, therefore, partakes of the nature of a mortgage. *It is also subject to redemption.* The pledgor, on payment of the debt or tender, is entitled to a return of the *identical property pledged,* and there can be no good reason why equity should withhold its aid for this purpose in a case in which the law can not accomplish it. Where the article pledged is a specific chattel, the law can afford an ample remedy by replevin if the pledgee retains possession, or by trover or *assumpsit* in case he has parted from it. But in a case like the present, that of stock of an incorporated company, when the shares have been transferred upon the books of the corporation and stand in the name of the pledgee as legal owner, the law falls short of the remedy asked and to which the pledgor is entitled. Equity alone, in such a case, can afford relief by an order of retransfer. If a pawnee has two remedies, to sell at law after failure and notice, or to foreclose in equity (2 Kent's Com. 582-583), no reason exists why the pledgor should not be furnished with the equitable remedy to redeem.''

In the case at bar the pledgor has alleged not only that the property pledged is stock in a private corporation, but that the shares pledged constituted a majority of the stock in an opera house, giving to the holder necessarily the power to control the management of said theatre; that the pledgee had by a fraudulent, unfair and unjust and pretended sale bought the same in its own name and caused the same to be transferred on the books of the corporation in the names of other parties, but that said transfers were so made that defendant still controls and can produce the same, and prays to be allowed to redeem the same by paying into court the debt for which they were pledged, together with interest and all proper charges and for general relief.

It will be observed that the bill necessarily also calls for an accounting and discovery, which is everywhere

recognized as another ground for equitable relief. In its answer the defendant denied that it had caused a transfer of the stock. Upon these allegations in the bill and answer there can be no doubt that the pleadings stated a case falling under a well-established head of equity jurisprudence. The plaintiff having pledged his stock as security for a loan made to him by the defendant, we next inquire what were the rights of the defendant upon default by the plaintiff in the payment of the debt. That defendant might sell at a public or private sale is not questioned, but "the failure to pay the debt at maturity did not vest the property in the pledgee. The pledgee's possession is not regarded as adverse to the pledgor, and does not bar his right to redeem unless it has continued so long a time as to raise the presumption that the pledgor has relinquished his title in satisfaction of the debt." [Railroad v. Iron Co., 50 N. H. l. c. 60.]

While, therefore, the right of defendant to sell is not questioned, the plaintiff had the right to have a fair sale made.

As said by this court in Laclede National Bank v. Richardson, 156 Mo. l. c. 279, "Such a power" (i. e., the power to sell the pledge) "given by contract, however, so far as it enables the pledgee to extinguish the right of the pledgor to redeem, will, as other contracts affecting equities of redemption, be construed favorably for the interests of the pledgor, so far as consistent with the rights of the pledgee . . . and a sale must not be forced for barely enough money to secure the payment of the debt," and adds, "It devolves upon the pledgee in the exercise of the powers given under the pledge *to so conduct the sale* as not to sacrifice the securities held by him, and in the event the pledgee unfairly or unnecessarily prejudices the rights of the pledgor, the sale will be set aside." In that case "the referee declared the sale invalid because the printed notice of the sale did not state *upon what authority* or by *virtue of what*

*power* the sale was to be made, no reference whatever having been made to the pledge or power under which Mott" (the agent of the bank) "was acting in making the sale, nor was any mention made of the ownership of the collaterals, nor was it stated upon what terms the sale would be made, whether for cash or on time; besides, there was nothing in the published notice indicating that the sale of these securities was made in behalf of the bank."

All of which this court unanimously approved in that case. The circuit court required the bank to account for all the notes purchased by it at such sale, finding in favor of the bank only for the amount remaining due after such accounting and this court affirmed the judgment of the circuit court.

In view of these just and well-settled principles of equity it must be held that, under the power given the bank, the defendant in this case, to sell at public or private sale with or without notice, it still remained its duty to make the sale fairly and with a view to make the securities sell to the advantage of the pledgor, the plaintiff herein, as well as for its own interest. This trust, broad and ample as it was, was not intended as a power of attorney to go through a meaningless form by which plaintiff's stock was to be sacrificed without any regard to fairness. Keeping in view the equitable doctrines announced by ROBINSON, J., in Laclede National Bank v. Richardson, supra, what were the facts attending this sale? We need notice only the testimony of Wernse, the broker employed by the defendant to make the sale, and that of Mr. Baker, the president. Mr. Baker says there was no advertisement whatever informing the public that the stock would be sold or announcing the terms of the sale or the authority by which the sale would be made. In fact there was no attempt whatever by the bank to advertise the sale or to give public notice. Both Mr. Baker and Mr. Marshall, the cashier, testify that they did not notify anyone that the

sale was to be made. Just before noon, Mr. Marshall took the stock and started to the Merchants Exchange, and on his way called upon Mr. Wernse, a broker, and requested him to go with him to the Merchants Exchange and auction the stock at 12 o'clock. Mr. Marshall was on the Exchange for some time before 12 o'clock with Hagan's stock and notes, but did not inform a single person there that the sale was to take place. Wernse after he came did not inform any member that the sale was to be made. At noon Wernse mounted a little rostrum or platform on the floor of the Exchange and made this announcement: ''We will offer for sale, for cash, to the highest bidder, for the account of whom it may concern, 770 shares of the Hagan Opera House stock, par value $100 per share.'' ''I also announced that unless I knew the bidder to be a responsible party I would require $2,500 or $5,000 in cash or certified check immediately on the bid being closed. I also announced that if any one desired to have small lots put up, that I would put it up in ten share lots or any multiple that might be desired.'' That was all the announcement made.

Asked by the circuit court if he stated who was the owner of the stock, he answered he did not. He didn't know who was the owner. ''Did you state to whom it was pledged?'' ''No, sir.'' ''Did you state by what authority you were selling?'' ''I did not.''

Under these circumstances Mr. Marshall, the cashier of the defendant, was the only bidder, and bid $5,000, and it was knocked down to him.

Recurring now to Laclede Bank v. Richardson, 156 Mo. l. c. 280, this court said: ''In the circumstances of the case, we are of opinion, that it devolved upon the pledgee in its notice of sale to refer to or state the power and authority under which the sale was to be made; but it is contended by counsel for appellant that inasmuch as no notice was provided for by the collateral notes, the bank was at liberty to act as it saw fit

in this regard, provided some notice was given to the public of the sale. This, as already seen, is not the law. The clause authorizing the sale of the securities in question without notice must, we think, be held to refer to a waiver of notice only so far as the pledgor was concerned, and has nothing whatever to do with a public sale. The latter, as we have seen, could not be made without some due *notice to the public*. Otherwise what could reasonably. be anticipated but a sacrifice of the security for want .of bidders duly informed upon the subject?'' Again referring to the notice made by Mr. Mott that he would ''sell for the benefit of *whom it may concern*,'' the exact form adopted by Wernse in this case, this court condemned that practice, saying, ''If the advertisement had been in the name of the bank or so framed as to state upon what authority or by virtue of what power the sale was to be made, the public would thereby have been apprised that the bank was .seeking to sell certain securities upon which it had loaned money, and its known financial standing in the community would doubtless have called more bidders together, and resulted in a more advantageous sale.''

In that case some notice was attempted, but because of the failures noted this court held the sale invalid and required the bank to account for the securities. In this case no notice whatever was attempted. It requires little discrimination to see that this was a more unreasonable and unfair exercise of the power conferred to sell at public sale. It can not be doubted that defendant was attempting to make what it considered would be a compliance with the power to sell at public sale and it seems to us no one can fail to condemn it as inequitable and unjust to plaintiff and a ruthless sacrifice of his stock.

Moreover, if the bank intended to execute the power to sell at a public sale, as all the evidence tends to show, it was bound to pursue those methods ordinarily adopted in making public sales, and such a sale presupposes a

sale at a public place; a place to which the public can have access. Such a place as the Merchants Exchange, from which the public is barred, is not. The by-laws of the Exchange read in evidence prohibited any and all persons not members of the Exchange from buying or selling on its floors. To hold such a place a public place within the legal or equitable acceptation would be repugnant to all of our customs in conducting such sales, and to all our statutes providing for their conduct.

But a public sale also implies a notice to the public in order that purchasers may advise themselves of its terms and the title to the property, and be enabled to bid intelligently. The evidence of the president, the cashier, and the broker who cried the sale, leave no doubt whatever that they gave no notice of their intention to sell this stock when they did, to anyone but the pledgor, and he was not a member of the Exchange, and could not be present, and had he been present could not have bid at the sale. The result was such as can always be anticipated under such circumstances. The stock which the bank took as security for over twenty thousand dollars indebtedness sold for $5,000.

The circuit court was clearly right in setting aside the sale, and we have no doubt whatever of the jurisdiction of a court of equity to avoid such sale.

On this ground plaintiff had a firm standing in equity, especially as the bank afterwards asserted title under that sale and insisted that the equity of redemption was forever foreclosed. It was necessary for plaintiff to remove this barrier in a court of equity before he could require the bank to account to him for the proceeds of the subsequent sale to Jannopoulo. A court of equity having acquired jurisdiction for one purpose, it is a maxim of equity that it will proceed to do complete justice between the parties, and proceed to a final determination of all the matters in issue. [1 Pomeroy's Eq. Juris., sec. 181, and cases cited; Keeton v. Sprad-

ling, 13 Mo. 321; State v. McKay, 43 Mo. loc. cit. 598; Real Estate Savings Inst. v. Collonious, 63 Mo. 290.]

The allegations as to the unfairness of the sale brought the case within the jurisdiction of a court of equity, and the evidence having fully substantiated the charges of the bill, the circuit court properly held that the bank stood in relation to the stock after the sale just as it did before the sale.

But the bank had the power to sell the stock at private sale, and after it had gone through the form of a sale to itself, it still held it as a pledge, and had the power to sell as it did to Jannopoulo. When charged with having had it issued to Jannopoulo and others on the company's books, but at the same time retaining possession and control of it, it denied the charge in its answer.

On the trial it appeared it had in fact sold it to Jannopoulo for $30,000, and that he was an innocent purchaser for value and without notice.

The circuit court under the evidence found itself unable to decree redemption in kind but under the prayer for general relief, it required the bank to account for the amount of the purchase money and deducted plaintiff's indebtedness from the $30,000, and gave judgment for plaintiff for the balance.

It is urged with much zeal that this was *first* inequitable, because it is said that said sale was "purely speculative," and the bank should not be held to account for that sum; that the measure of damages is the difference between the market value and the balance due on the debt. As the bank stood in the relation of trustee to the plaintiff in the sale of his stock to Jannopoulo upon the plainest principle of equity it will not be permitted to manage the trust so as to gain an advantage to itself beyond its legitimate claim for its debt and necessary expenses and a court of equity will closely scrutinize all its dealings with the trust fund.

Having assumed to sell this stock at private sale

to Jannopoulo for thirty thousand dollars; having transferred the stock on the corporation books, and caused new stock to issue therefor to Jannopoulo and others, received part of the consideration in actual cash and taken Jannopoulo's note for the debt and extended the time for its payment and without a scintilla of evidence that it did not intend to hold Jannopoulo to his agreement under any and all circumstances to the payment of the thirty thousand dollars he had agreed to pay for it, the plea that this was merely a "speculative" sale can not be entertained when the bank is called upon to account for the proceeds of that sale. There was no evidence that Jannopoulo was insolvent, or that would absolve him from paying the thirty thousand dollars for the stock, and there is nothing to justify a finding that he could not be compelled to pay the whole amount he had agreed to pay. Having dealt with the stock as its own, and agreed to accept Jannopoulo's promise for the thirty thousand dollars without the assent or intervention of plaintiff in any manner to the arrangement, we are clear the bank is now estopped to deny that the price for which it sold the stock was not its real value. It can not hold on to Jannopoulo's notes and the stock upon that basis, and account to plaintiff on the basis of its market value. The extension it granted Jannopoulo does not make its sale to him less absolute and binding. It assumed to grant him those favors with full knowledge of the value of the stock and property.

This court, in Brinkerhoff-Faris Trust and Savings Company v. Lumber Company, 118 Mo. 447, held that while the measure of damages for the conversion of stock is generally its market value, yet when it has no market value resort may be had to other modes to establish its real value, such as proof of its earning capacity, the value of the assets of the corporation and individual sales of stock not under compulsion, and the same doctrine was approved and re-affirmed in Greer v. Lafayette Bank, 128 Mo. loc. cit. 575. In view of all the evi-

dence as to the cost of the theatre building; its rental value; the offer of $50,000 by Jannopoulo just a short time prior to this time, and the fact that it constituted the majority of the stock, enabling its holder to control and manage the property, we are unable to say the circuit court erred in accepting the value which the defendant placed upon the stock when it sold it to Jannopoulo as the true value of the stock, for the basis of an accounting between plaintiff and defendant. None of it had been sold on the market and it had no market value.

But secondly it is said defendant was entitled to a jury to estimate the value of the stock; that there was no basis for the finding of the court in the pleadings; that such an issue was not tendered.

Having, as we think, demonstrated that both the pleadings and the evidence established a case falling under a well-recognized head of equity, to-wit, a case entitling plaintiff to the remedy of an accounting and redemption, it goes without saying that there was no right to a jury in an equity case.

It is settled law that the right of trial by jury does not extend to the trial of equity causes. [O'Day v. Conn, 131 Mo. 321; Conran v. Sellew, 28 Mo. 320; Weil v. Kume, 49 Mo. 158; Estes v. Fry, 94 Mo. 266.]

As already said, the circuit court having acquired jurisdiction as a court of equity for one purpose it was competent to dispose of any and every issue that arose therein, and, moreover, there was no demand for a jury in the case and it would have been properly refused if made.

But again counsel urge there was no allegation on which to base the judgment of the court allowing a money judgment. This is untenable for two reasons. There never has been any want of power in a court of court of chancery to render a money judgment on an accounting or in a case where its power to compel the return of specific property results from the misconduct

of the defendant which was unknown to plaintiff when the suit was instituted. [Holland v. Anderson, 38 Mo. 55; McDaniel v. Lee, 37 Mo. 204; Ryan v. Dunlap, 111 Mo. 620; Hamilton v. Hamilton, 59 Mo. 232; 3 Pomeroy, Eq., sec. 141o; Watermann on Spec. Perf., secs. 514 and 515; Woodman v. Freeman, 25 Me. 531.]

In this case the impossibility of a redemption in kind was disclosed on the hearing when for the first time it appeared that Jannopoulo was an innocent purchaser and defendant could not therefore be compelled to return the stock in kind and plaintiff was ignorant of this when he brought his suit. Under these circumstances there was no occasion whatever for amending the pleadings as to the amount of damages. The whole facts were before the court and both sides were fully heard as to the value of the stock and the chancellor was vested with full power to adjust the balance due. But in fact the discussion of the right to award damages as such is not properly in the case. The court took the view most favorable to defendant and merely charged the defendant with the amount for which it sold the stock and deducted therefrom the amount of plaintiff's debt and adjudged the balance to plaintiff, the amount for which in equity and good conscience it was bound to account to plaintiff. Having held as we have that defendant was estopped after selling this stock for $30,000, from saying its transaction with Jannopoulo was a mere speculation and was bound to account for the balance in its hands over and above the plaintiff's debt to it, the case is one merely of accounting in equity and there can be no doubt of the jurisdiction of equity in such a case. [Laclede National Bank v. Richardson, 156 Mo. 270.]

When the bank sold to Jannopoulo at a private sale as it had the right to do notwithstanding its futile effort at a public sale it was bound in equity to apply the proceeds to the payment of the notes for which it held plaintiff's stock as a pledge and account to plaintiff for

the excess after satisfying its debt and this is all the circuit court required at its hands.

. As to the only remaining proposition, that plaintiff could not recover because he did not first tender the whole amount of debt and interest, it is sufficient to say this is a bill in equity to be allowed to redeem after defendant had expressly denied such a right and as a tender under such circumstances would have been an idle ceremony, a court of conscience will not turn him out of court for a failure to perform an useless and ineffectual act.

The decree must be and is affirmed. *Robinson, C. J., Brace* and *Valliant, JJ.,* concur; *Marshall, Burgess* and *Fox, JJ.,* dissent.