FRED L. COLE, Plaintiff, *v.* MANUFACTURERS TRUST COMPANY and Others, Defendants.

Supreme Court, Special Term, Kings County, August 31, 1937.

*Sidney M. Wittner*, for the plaintiff.

*Newman & Bisco* [*Leonard G. Bisco* of counsel], for the defendants.

SMITH, J.   On December 18, 1933, plaintiff's assignor, Thomas F. Cole, in consideration of various loans theretofore made to him, executed and delivered to defendant Manufacturers Trust Company two promissory notes payable on demand — one for $1,110,355, representing the principal amount of the loans, and one for $93,350.84, representing the accrued interest on the loans. As collateral security for the payment of these obligations, Thomas F. Cole deposited with the trust company numerous negotiable stocks and bonds.   A schedule of these securities is annexed to the note for the larger amount.   With respect to such securities held as collateral, this note provides that upon default they may be sold, without notice, at public or private sale, or upon any exchange or brokers' board, and that upon such a sale the trust

company shall have the right to purchase all or any of the securities. The specific provision of the note will be quoted at length below. The trust company, for its convenience, caused the securities to be registered in the name of its nominee, Rechel & Co.

The notes not having been paid on demand, the trust company in September, 1935, liquidated substantially all of the securities held by it as collateral. It effected the liquidation by causing entries to be made upon its books and upon the books of its nominee, Rechel & Co. These entries simply showed a transfer of the securities from Thomas F. Cole to the trust company for a consideration of $870,569.37. As a result of such liquidation, this sum was credited upon the notes, leaving a balance of $353,169.35. For this latter sum plaintiff's assignor, on November 9, 1935, executed and delivered to the trust company his promissory note dated October 1, 1935. Plaintiff's assignor was given no notice and had no knowledge of the manner in which the securities were liquidated. The trust company simply notified him that it " intended to commence to sell the collateral " if the indebtedness were not paid. Neither the time, nor the place, nor the manner of the sale was mentioned.

Plaintiff claims that thereafter his assignor for the first time learned that his securities were liquidated, not by a sale as provided in the note, but in the manner above mentioned. Accordingly, on November 13, 1936, plaintiff's assignor disaffirmed the purported sales or transfers, demanded the return of his note dated October 1, 1935, and of all his securities pledged as collateral, and offered to pay to the trust company the amount of his indebtedness. The trust company having refused his demand and offer, plaintiff, as assignee, now brings this action for conversion of the securities. He seeks to recover the value of the securities as of November 13, 1936, $2,340,772.15, less a credit of $1,777,000, leaving a balance of $1,163,772.15 plus interest.

The complaint alleges four causes of action against the trust company, its directors, and the members of Rechel & Co. One upon the theory that the trust company, although authorized upon default in the payment of the indebtedness to sell the collateral at public or private sale without notice and to purchase all or any part of said collateral at such a sale, in truth and in fact did not hold a public or private sale, and instead the trust company, without notice to plaintiff's assignor, attempted to purchase the securities merely by making book entries showing a transfer of the securities to it. A second, upon the theory that the trust company notified plaintiff's assignor that upon default it intended to sell the collateral in the public market, and thereby the trust company " waived the right to sell the said securities at private sale

and waived the right to purchase the collateral at such sale and the right to sell the collateral without further notice; " and that in disregard of such notice the trust company instead of selling the securities at public sale, merely made nominal transfers on its books and on the books of Rechel & Co. A third, upon the theory that the trust company notified plaintiff's assignor that upon default in the payment of the indebtedness it would proceed to sell the collateral " on the public market through the various securities exchanges in small quantities and in an orderly and judicious manner extending over a period of time; " that this representation was false because no such sales were made and the transfer of the securities was effected by book entries as above described, and that in reliance on such false representation plaintiff's assignor was " induced to refrain from redeeming the said collateral and from protecting his equity of redemption therein." And a fourth cause of action upon the theory that all the acts specified in the prior causes of action were done pursuant to a conspiracy among all the defendants to deceive and defraud plaintiff's assignor by inducing him to refrain from redeeming the collateral and from protecting his equity of redemption therein.

Defendants have served an answer to the second, third and fourth causes of action. We are now concerned only with the first cause of action. As to this, defendant Manufacturers Trust Company, and the defendants Rechel, Robins, Rubin and Kaufman, copartners, comprising the firm of Rechel & Co., have made the present motion to dismiss it, pursuant to rule 106 of the Rules of Civil Practice, on the ground that on its face it fails to state a cause of action.

The moving defendants, for the purpose of this motion, must be deemed to admit the truth of the allegations of the cause of action under attack. But admitting the truth of those allegations, these defendants contend that the transfer of the securities upon the books, as alleged, was a sale within the meaning of the provision of the note with respect to the disposition permitted to be made of the collateral upon default. A copy of the note is annexed to the complaint as Exhibit A. This provision, so far as material, reads as follows: " The undersigned further agrees that upon failure to pay this note or any of such other liabilities, claims and obligations on demand or other due date * * * said Company may forthwith * * * without demand of performance, or advertisement, or of notice of intention to sell, or of time or place of sale, or to redeem or other notice whatsoever to the undersigned, all of which demands, advertisements, and/or notices are hereby waived by the undersigned, to sell in one or more parcels at public or private sale, or at

the New York Stock Exchange, or at any other exchange or brokers' board at such prices as it may deem best, and either for cash or on credit or for future delivery any or all securities, rights of action or property of any kind held by it or to which it may be entitled, as collateral security for the liabilities, claims and obligations of the undersigned as hereinbefore provided, with the right to said Company at any such sale, public or private, to purchase the whole or any part of said securities, rights of action or property so sold, free from any right or equity of redemption in the undersigned, which right or equity is hereby expressly waived, applying the net proceeds to the payment of this note and of any of said other liabilities, claims and obligations of the undersigned to said Company and accounting for the surplus, if any, to the undersigned, who hereby expressly agrees to remain bound for the payment of any deficiency, with legal interest."

Under this provision the trust company was given the option or right to purchase all or any part of the securities " at any such sale, public or private," held without notice. According to the complaint, no sale, public or private, was held. It is admitted that the purchase by the trust company was effected by book entries, which resulted in a credit upon the notes of $870,569.37. The question is whether such entries are *the sale* or are equivalent to the sale comprehended by the provision of the note quoted above. The moving defendants have narrowed the question further by taking the position in their brief that the entries constitute the trust company's purchase at a private sale. Of course, the defendants could not very well take any other position, for it is admitted that no attempt was made to hold any other kind of sale. The precise question to be determined, therefore, is whether within the meaning of the language used in the note the entries do, in fact, represent the trust company's purchase at a private sale. If they do, then the cause of action against which the motion is directed is insufficient.

Where personal property, particularly negotiable securities such as stocks and bonds, is pledged as collateral for a debt, the relation of the parties with respect to such collateral is that of a trustee and *cestui que trust*. The pledgee's " character is that of trustee for the pledgor, *first*, to pay the debt, and *second*, to pay over the surplus, and he cannot so deal with the trust property, so as to destroy or even impair its value." (*Wheeler* v. *Newbould*, 16 N. Y. 392, 398; *Gillet* v. *Bank of America*, 160 id. 549, 560; *Toplitz* v. *Bauer*, 161 id. 325, 332; *First Trust & Deposit Co.* v. *Potter*, 155 Misc. 106, 110; Colebrooke on Collateral Securities [2d ed.], § 87.) " The very nature of the transaction gives rise to a trust

relation between the pledgor and pledgee, with its consequent duties to protect the debt or obligation and the collateral." (49 C. J. § 52, p. 921; *Keno* v. *Roeth*, 237 App. Div. 252, 254.) The relationship between the pledgor and pledgee is well defined in *Dibert* v. *D'Arcy* (248 Mo. 617, 647; 154 S. W. 1116, 1125):

" Whenever a person comes into the possession and control of the property of another, or in which another has an interest, he becomes, with reference to that interest, a trustee, and is charged by law as well as by good morals to exercise such control with due regard to the interests of the beneficiary. Sometimes the trust is implied by law, but oftener the relation arises out of contract between the parties themselves. The possession and control is thought to give the trustee such opportunities for oppression and wrong in the management of the property as calls for the closest scrutiny of his acts, and out of this arises one of the most important branches of equity jurisdiction. And where the trust is created and defined by contract the contract itself will be construed, in cases of doubt, favorably to the preservation of the interest of the beneficiary. (*Hagan* v. *Bank*, 182 Mo. 319; *Laclede National Bank* v. *Richardson*, 156 Mo. 270.)

" That this relation, with its consequent duties, exists between the pledgor and pledgee of collateral securities follows from the nature of the transaction. It is a trust for the protection of the debt and the creditor holds the collateral as the trustee and agent of his debtor for that purpose. (*Richardson* v. *Mann*, 30 La. Ann. 1060, and authorities cited.) "

Originally under the common law, upon default in the payment of a debt, the pledgee was required to obtain a judicial decree authorizing the sale of the collateral. Later this common-law rule was relaxed so as to permit the pledgee to dispose of the collateral at public sale and upon notice, but he was precluded from becoming a purchaser at any sale of the collateral. (Story on Bailments [8th ed.], § 310.) Due to the necessities of commercial dealings the rule was further relaxed. The law now recognizes the right of the parties to enter into a contract expressly removing these restrictions and giving the pledgee the power to sell at a public or private sale without notice, and to become the purchaser. (*Toplitz* v. *Bauer*, 161 N. Y. 325, 332; *Bryan* v. *Baldwin*, 52 id. 232, 235; *Strong* v. *National Mechanics' Banking Assn.*, 45 id. 718, 720; *Milliken* v. *Dehon*, 27 id. 364, 369; *Brown* v. *Ward*, 10 N. Y. Super. Ct. 660, 663; *Matter of Mertens*, 144 Fed. 818; *Hiscock* v. *Varick Bank of New York*, 206 U. S. 28, 38.) Such a contract is not against public policy. (*National Mill Supply Co.* v. *State*, — Ind. —; 6 N. E. [2d] 543.)

But such a contract will, " as other contracts affecting equities of redemption, be construed favorably for the interests of the pledgor, so far as is consistent with the rights of the pledgee." Its terms " govern the rights of the parties as to time, place and notice of sale, and must be strictly pursued." (Colebrooke on Collateral Securities [2d ed.], § 118; 49 C. J. §§ 241, 242, p. 994.) And like other contracts or statutes in derogation of the common law, it must be strictly construed. In order that the purchase by a pledgee be valid and effectual to pass title to him, the pledgee must bring himself strictly within the terms of the contract authorizing the pledgee to purchase. (76 A. L. R. 717, and cases there cited.)

Bearing in mind the trust relationship which exists between a pledgor and pledgee with respect to the collateral, and the strict construction in favor of the pledgor of any contract waiving the common-law safeguards surrounding a sale of the collateral, we may now consider the contract in suit. It provides, in substance, that upon default, the trust company may, without notice, sell the collateral at public or private sale and become the purchaser at such a sale. It is not claimed that the trust company conducted a public sale. But can it be said that the trust company, by making entries upon its books showing a transfer of this collateral and a credit upon the notes of $870,569.37, without notice to plaintiff's assignor, conducted a private sale at which it was the purchaser? I think not. In doing this the trust company was merely retaining or taking over the collateral at a certain price. Whether this price was fair or unfair, or whether it was the highest price obtainable under all the circumstances, it would obviously be impossible to determine from book entries which reflect the transaction. It may be true that " in most banking loans on collateral the bank reserves the right to sell the collateral on default or to retain it itself at a fair value and apply the proceeds on the loan." (*Stevens* v. *Mutual Life Ins. Co.*, 227 N. Y. 524, 528.) But the point is that the contract here, neither expressly nor by implication, gave the trust company any right to retain or take over the collateral, either at the fair value, the market value, or at any other valuation. It could obtain the collateral only by purchasing it at a *sale*.

It seems far fetched and almost absurd to argue that the book entries constituted a sale. When the contract here speaks of a sale it means a sale as commonly understood, that is, a sale where third parties either bid or are given an opportunity to bid and to become the purchasers. At a sale so conducted the contract gives the trust company the option to become the purchaser.

The obvious purpose of such a stipulation in the contract is to stimulate competition and to permit the highest bidder, whether he be the pledgee or a stranger, to buy in and thus to obtain for the benefit of the pledgor as well as for the benefit of the pledgee as much as possible upon the collateral. The importance of this stipulation and of adhering to its purpose is emphasized when we realize that the pledgee may, and usually does, sell the collateral without notice to the pledgor of the time and place of sale and without giving him an opportunity to protect himself. The pledgee is expressly given the right or option to purchase at the sale in order to remove the common-law restriction against his becoming the purchaser. Clearly, therefore, he should not be permitted to utilize this option in any manner which would result in precluding the possibility of competitive bidding or in dispensing with a sale as ordinarily conducted. This is one right which the pledgor has not bargained away. To permit the trust company to take it arbitrarily, as it has done here, is to defeat the very purpose of the contract and to place the pledgor at the mercy of the pledgee.

Of course, the defendants urge — although it nowhere appears — that the trust company paid the market price for the collateral and hence plaintiff was not prejudiced by the manner in which it conducted the " sale." The point is, however, that the trust company, if it conducted any sale at all, conducted a private sale. It did not sell, or attempt to sell, the stock on the Stock Exchange or at a public sale. At a private sale the market price is not necessarily the criterion of the true value of the securities. It may well be that at a private sale one interested in the securities might pay considerably more than the market price, either because he desired to keep them out of the open market or because the immediate acquisition by him of large blocks of these securities would enable him to gain control of certain corporations. As a trustee the pledgee is duty bound to make every reasonable endeavor to obtain the highest price possible, not merely the market price. In any event, the price paid by the trust company, whether it be the market price or any other price, is immaterial; nor does plaintiff complain of inadequacy of the price paid. The sole determining factor here is whether or not the trust company actually conducted a private sale. If it did, its purchase was authorized. If it did not, its purchase was unauthorized regardless of the price it paid.

The defendants argue that in taking over the securities at the market price — and since there is no claim of inadequacy of prices it will be assumed, without proof, that the price was paid on the basis of prevailing market prices — the trust company did all that

could be done with respect to conducting a private sale and buying in thereat, pursuant to the terms of the contract. In their brief the defendants pose the question: By what method can the parties effectuate a private sale at which the pledgee shall be the purchaser " other than by the pledgee taking in the property, making appropriate book entries to show the transfer and assumption of ownership by himself, and giving the appropriate credit upon the indebtedness for the fair value of the securities thus taken over? " They naively ask: " What more could one want? " They then proceed to answer their questions by saying that " Doubtless the pledgee could stage a mock performance to give the appearance of physical activity. The bank's officers might go to a street corner and issue a proclamation to themselves that they were buying in the pledged property; they might transport the physical securities from the bank to the street corner and then back to the bank and they might take cash from the bank's till to pay the proceeds of sale, put the cash back in the till and give the pledgor credit for the amount of the proceeds." That, they say, is " perhaps the utmost that one could do towards conducting a private sale and buying in property which is already in his possession."

The defendants overlook entirely the spirit and purpose of the provision of the contract authorizing the trust company, without notice, to sell at a private sale and to become the purchaser. As I have pointed out above, the primary object of this provision is to insure a sale — an ordinary sale — one at which the securities will be exposed for sale, at which there shall be competitive bidding, and at which the highest bidder, whether he be the pledgee or a stranger, shall become the purchaser — all with the end in view of realizing as much as possible on the collateral. That is the common-sense construction of this provision. That is the duty which the pledgee, by reason of his trust relationship, owes to the pledgor. It is the only manner in which the pledgor can be assured that the highest price obtainable has, in fact, been obtained. When the defendants ask, " What more could one want," the answer is simple: One would want such a private sale. And when the defendants ask, " By what method can such a sale be accomplished," the answer is equally simple: By notifying a fair number of persons known or believed to be interested in the purchase of the collateral to submit written bids within a certain time, or to make oral bids at a specified time and place, to have the pledgee — the trust company — submit its own bid, and then to permit the highest bidder, no matter who he may be, to become the purchaser, and to reject all other bids. Of course, this method is not exclusive. Any equitable method, that is, one which permits competition

and which exhausts the possibility of obtaining a price better than the one finally accepted, would not be objectionable. It is a fallacy for the defendants to assume that at such a sale conducted in good faith there will be no bidders except the pledgee. It is conceivable, of course, that in some cases there may be no other bidders. But the pledgee, by its arbitrary conduct, has no right to foreclose in advance the possibility of other bids, particularly, since under the contract the pledgee as trustee is, in good faith, bound to realize as much as possible on the collateral.

Only in this, or in some similar manner (*Peschke* v. *Wright*, 93 Misc. 154, 157), where a private sale is held in the true sense of the word — where competitive bidding is invited and is unrestricted — may the trust company become the purchaser. For the "private sale" spoken of in the contract, and which was within the intention of the parties, was clearly a private sale to be made in the ordinary way. (*Milliken* v. *Dehon*, 27 N. Y. 364, 369.) The manner in which the trust company conducted this "private sale" was extraordinary and unusual. The trust company in advance eliminated all negotiation and competition with third parties. It made the sale a secret transaction between itself and its nominees. It rendered it impossible to secure any other bid or a better price. Even a private sale, when conducted in the ordinary manner, "must be fair and open" in order to be valid. (*Milliken* v. *Dehon*, 27 N. Y. 364, 376.) The incidental fact that the trust company may actually have paid the market price cannot save the transaction from condemnation or bring it within the purview of the contract.

The defendants also take the position that the manner in which the trust company acquired the collateral "was the customary and usual way of a pledgee consummating a private sale of collateral to itself," and that a contrary holding would overrule the established practice of banks and financial institutions. This may be true when the pledgee acquires the collateral under a form of note which expressly authorizes the pledgee to retain the collateral at a fair value or at the market value or at an appraised value, and to apply the proceeds on the loan. But I seriously doubt whether that is the practice where such a provision is absent from the note, as it is from the note in suit. If banks and financial institutions have been resorting to this practice under a note such as the one in suit, the practice clearly is unauthorized. In any event, irrespective of what the practice may be, custom and usage may not be invoked "in contradiction to the fair and legal import of the contract." (*Wheeler* v. *Newbould*, 16 N. Y. 392, 402; *Allen* v. *Dykers*, 3 Hill, 593, 597.) Here the fair legal import

of the contract does not justify the trust company in conducting a private sale in the manner in which it attempted to conduct it, that is, by book entries; and this court is averse to sanctioning such a loose and unwarranted practice.

Of course, it may be argued that the meaning of the contract or note is ambiguous. As I have already pointed out, I think the meaning is clear. The pledgor has waived almost every common-law right — the right to have the sale conducted publicly, the right to receive due notice of the sale, and the right to have the pledgee refrain from becoming the purchaser — but he has not waived the right to have the collateral sold at a sale to the highest bidder. To now construe this one right which the pledgor reserved in the manner in which the defendants contend it should be construed, would emasculate it completely and would, as already stated, place the pledgor at the mercy of the trust company. The trust company could then secretly select any time favorable to it, and pay any price which it deemed fair, and the pledgor would have no redress. For instance, it could, without notice to any one, transfer or purport to sell securities to itself on a rising market and at a price far below their intrinsic worth. In such a case the fact that the trust company might credit the pledgor with the value of the securities at the market price prevailing at the time of the transfer would not cure the wrong or compensate plaintiff for the loss thus sustained. Moreover, after such a transfer or sale the trust company could credit the pledgor with their value based on the market price prevailing as of any date it might select, depending on whether the securities subsequently depreciated or appreciated in value. In other words, the trust company as pledgee would have it within its power to appropriate the pledge to itself or to effect a forfeiture and deprive the pledgor of the right of redemption. The grant of such a power to the pledgee was always abhorrent to the common law and was denounced and proscribed by it. (Story on Bailments [3d ed.], § 345; Denis on Contracts and Pledge, §§ 299, 302; *Vickers* v. *Battershall*, 84 Hun, 496 [2d Dept.].) The power to sell, whether at private or public sale, should not be construed in a manner which permits the pledgee to sell secretly or to one not the highest bidder, for to do so would be contrary to the general rule that the sale must be fair and open. (*Dykers* v. *Allen*, 7 Hill, 497, 499; *Wheeler* v. *Newbould*, 16 N. Y. 392, 400; *Milliken* v. *Dehon*, 27 id. 364, 376.)

It may not be said, on this motion to dismiss, that the trust company took advantage of the pledgor or abused its power; and I do not say so. I merely mention these possibilities in order to indicate the dangers which inhere in the construction urged by

the defendants and the improbability that the pledgor ever understood that the note gave the trust company any such right.

Therefore, even if it be assumed that there be some ambiguity in the note, it cannot be construed to give the trust company the right which it arrogated to itself, namely, to effect a sale without notice by mere book entries.

In considering a bank collateral note containing similar, although not identical, provisions, the Court of Appeals in *Gillet* v. *Bank of America* (160 N. Y. 549, 555, 557, 558) has laid down several familiar rules: (1) " If the language of a promise may be understood in more senses than one, it is to be interpreted in the sense in which the promisor had reason to believe it was understood." (2) " Where there is uncertainty or doubt as to the meaning of words or phrases used in a contract, in seeking for the intent of the parties as evidenced by the words used, the fact that a construction contended for would make the contract unreasonable and place one of the parties at the mercy of the other, may properly be taken into consideration." (3) If there be any doubt or uncertainty it should be resolved against the one who prepared the agreement — that is, against the bank. (See, also, *Aldrich* v. *New York Life Ins. Co.*, 235 N. Y. 214, 223, 224.) It has also been said that " Form should not prevail over substance and a sensible meaning of words should be sought " (*Atwater & Co.* v. *Panama R. R. Co.*, 246 N. Y. 519, 524; *Heller* v. *Pope*, 250 id. 132), and that any construction which places one party at the mercy of the other is to be avoided. (*Atwater & Co.* v. *Panama R. R. Co.*, *supra.*) To these rules should also be added the rules already mentioned, namely, that " The provisions in a pledge agreement authorizing the pledgee [to purchase] will be strictly construed, being in derogation of the common law; and in order that the sale and purchase be valid and effectual to pass title to him, the pledgee must bring himself strictly within their terms." (76 A. L. R. 717.)

The application of any one or all of these rules of construction to the contract in suit — assuming that its meaning is ambiguous — leads me to the same conclusion, to wit, that a private sale in the common-sense understanding of the term was contemplated and that a transfer by book entries, without notice, cannot be deemed to constitute such a sale or a purchase by the trust company thereat.

I have gone into this question and have given my views at length because the defendants say the question is of extreme importance to banks and financial institutions and because there appear to be few authorities bearing directly upon it.

However, an examination of all the authorities clearly indicates that they support the conclusion I have reached. I shall refer below to those which are more pertinent:

In *Manning* v. *Heidelbach* (153 App. Div. 790) the collateral agreement given by plaintiff to defendants authorized the latter in case of default to sell the securities, without notice, either at public or private sale, and if the sale were made " at brokers' board or at a public auction " the defendants were given the right to become the purchasers. Thereafter defendants, without notice, sold the stock upon the curb and became the purchasers. Plaintiff sued for conversion, claiming *first*, that defendants had orally promised that they would not sell without notice, and *second*, that the sale was not properly conducted because the securities were sold upon the curb. Mr. Justice McLAUGHLIN, writing for the Appellate Division, First Department, stated: " I am of the opinion that the evidence was sufficient to sustain a finding that the oral promise not to sell without notice was made. But irrespective of this question I think the plaintiff, so far as the sale of the Tobacco stock was concerned, could treat it as though no sale had been made. The sale of this stock, as already said, was upon the curb. Defendants purchased it themselves; in other words, they, in effect, took it at a price named by themselves. The collateral agreement gave them the right to become purchasers only in case the sale were made ' at brokers' board or at public auction.' This sale was not at either. It was made in the street at a place where street or curbstone brokers were accustomed to congregate and trade with each other on their own account or for others. Brokers dealing in this way do not constitute a brokers' board. (1 Bouvier Law Dict. [Rawle's Rev.], 268.) It may be that the defendants took the stock at a price as high as could have then been realized had the sale been made either at brokers' board or public auction, but they had agreed with the plaintiff if they became the purchasers the sale should be made in a certain way. This agreement they violated and this gave the plaintiff the right to treat the sale as a nullity and to get back his stock on paying the indebtedness."

It must follow if a sale on the curb where competitive bidding is available is insufficient to constitute a sale " at brokers' board or public auction " regardless of the price paid, that a mere transfer by book entries without the possibility of competitive bidding is wholly insufficient to constitute a " private sale."

In *Union & Mercantile Trust Co.* v. *Harnwell* (158 Ark. 295; 250 N. W. 321) the note recited that upon non-payment the pledgee, that is, the bank, was authorized to sell the collateral —

a $3,000 note of defendant Harnwell — at public or private sale, without notice, and to become the purchaser. A default having occurred, the pledgee notified the pledgor, one Wirbel, that it would offer the collateral for sale to the highest bidder at a specified time and place. No one appeared at the sale and it was consummated by the pledgee bidding in the collateral for the amount of the pledgor's indebtedness, $2,030.15. The pledgee, the bank, brought this action to enforce payment of the collateral. The court held that the sale was invalid and could not be sustained either as a public or private sale, and hence the bank acquired no title to the note. The court, after considering generally the nature of a public and private sale, stated: "Applying these elementary principles to the facts of this record, it is clear that there was no sale, either public or private, of the Harnwell note, according to the terms of the contract by which Wirbel pledged said note to the appellant as collateral. There was no private sale, because there was no negotiation whatever by the appellant, the seller, with any third party as a prospective buyer for the sale and purchase of the Harnwell note. The contract of pledge certainly did not contemplate that the appellant, as pledgee of the property, could purchase the collateral itself, paying as a consideration therefor Wirbel's debt to it, without making any effort whatever to sell the collateral to a third party. The contract of pledge provided that the appellant, as pledgee, could sell the Harnwell note at private sale, but this contemplated a sale to a third party and not to appellant itself. There is nothing in the contract to justify the conclusion that the parties to the contract of pledge intended that the appellant should have the power to transfer to itself title to the Harnwell note by simply satisfying Wirbel's debt, without any endeavor to see whether third parties were willing to pay more for it. The appellant, in making the sale of the Harnwell note, was a trustee for Wirbel, its debtor and pledgor, and it was appellant's duty to adopt all reasonable modes of procedure in order to render the sale most beneficial to the debtor. It could not discharge this duty by simply resolving in its own mind that the property pledged was worth no more than the debt of the pledgor, and that, therefore it would sell the Harnwell note to itself by satisfying this debt and transferring the pledge, so to speak, from one pocket to the other. See *Fitzgerald* v. *Blocher*, 32 Ark. 742, and other cases there cited. See also *Hagan* v. *Continental Nat. Bank*, 182 Mo. 319; 81 S. W. 171. Wirbel's failure to pay his debt at maturity did not *ipso facto* vest title to the pledged property in the appellant, and appellant, by proceeding as it did, could not divest title out

of Wirbel, the pledgor, and vest it in itself, because there was no effort whatever, as we have stated, to consummate a private sale of the Harnwell note."

Likewise, in the present case it may well be said that there was no private sale because there was no negotiation whatever by the trust company with any third party as a prospective buyer of the securities. The trust company failed in its duty " to adopt all reasonable modes of procedure in order to render the [alleged] sale most beneficial to the debtor."

In *Lowe* v. *Ozmun* (3 Cal. App. 387; 86 P. 729) plaintiff brought an action for the conversion of securities pledged by him with defendant as collateral. The securities consisted of bonds of the value of $20,000. They were pledged to secure an indebtedness of some $10,000, which was evidenced by a promissory note. The note contained a clause authorizing defendant to sell the collateral " at public or private sale, at the option of the payee, without advertising the same or demanding payment of the debt or giving notice, and authorizing the pledgee at such sale to become the purchaser." Plaintiff having defaulted in the payment of the debt after demand therefor, defendant published a notice in an issue of one of the local daily newspapers dated May 4, 1897, that he would sell the collateral at public auction to the highest bidder on May tenth, without specifying the year, at a certain designated place and at a specified hour. Defendant was the only bidder, and he sold the bonds to himself for $4,748. The court held that the purported sale was invalid as a public sale because not made " in the manner and upon the notice to the public, usual at the place of sale in respect to auction sales of similar property," and because the sale in other respects failed to comply with the California statute governing public sales. But as to the validity of the sale, when considered as a private sale, the court stated: " This contract gave an optional right to the pledgee to sell, either at public or private sale. All of the elements of a public sale being omitted, and there having been no public sale, then the only sale which he was authorized to make was a private sale. This contract authorizing a private sale, without notice, must have a reasonable construction. The term ' private sale ' comprehends something more than a mere taking over of the property by the pledgee at such price as he may elect to consider an offer. This is, in effect, but a declaration of forfeiture, an agreement for which is invalid under section 2889, Civil Code. To give effect to the contract, if possible, is our duty. The agreement, then, that the pledgee may become purchaser at a private sale must be taken as meaning at a sale conducted in the manner usually and ordinarily followed in

relation to private sales of property. A sale of property is a contract, and like every other contract, requires an agreement between two or more. A mere taking over of the property without any agreement with another competent to contract is not a sale, in our opinion." Similarly, in the case at bar, the power given to the pledgee to become the purchaser at a private sale " must be taken as meaning at a sale conducted in the manner usually and ordinarily followed in relation to private sales of property." Clearly the trust company's conduct in retaining or taking over the collateral at a price fixed by it, without notice to the pledgor, cannot be denominated a purchase by it at an ordinary sale, as contemplated by the contract.

In *Ohio National Bank of Washington* v. *Central Construction Co.* (17 App. D. C. 524) the construction company was indebted to the bank for $17,868.11. The construction company delivered to the bank its demand note in that amount, and at the same time deposited with the bank as collateral security nineteen $1,000 certificates of a receiver of a railroad in Tennessee. The note provided that upon default the bank was authorized by its president or cashier to sell the collateral without notice or demand " at the Washington stock exchange, or at the banking-house of said bank, at public or private sale, at the option of said bank, or its president or cashier, with the right to said bank to purchase any or all of said securities at such sale." The construction company defaulted in the payment of the note. The bank, on January 19, 1898, at its banking house, without notice to the pledgor, sold the collateral to itself for $16,000, it being the only bidder. There was no one present at the sale except two or three officers of the bank, who at the time appeared to be engaged in their regular duties. It also appeared that the sale " was at the utmost a mere matter of form conducted by the president of the bank and the assistant cashier." Thereafter the construction company claimed that the sale was invalid and it brought this action for an accounting and for a vacation of the alleged sale. The court sustained the construction company's claim and set aside the sale. The court said, " as between the two parties to this suit, the mortgagor and mortgagee, it would be absurd to call by the name of sale the proceeding which took place at the banking house of the bank, on January 19, 1898, when the president of the bank, in the presence of two or three employees of the bank, who were attending at the time to their ordinary duties at their desks, without notice to any one or any possibility that any one else could become the purchaser, put up these securities for sale, and bid them in for the bank for the sum of $16,000. If he had merely gone to his bookkeeper

and told him to enter these securities on his books as the property of the bank, and at the same time to enter a credit of $16,000 on the note, the proceeding would not have been more absurd.   *   *   * the sale in question can not be sustained upon any principle of equity; and it must be regarded, so far as the mortgagor is concerned, as an absolute nullity.   No such sale was contemplated by the parties in their agreement; for it is not possible that there can be a private sale, in the sense of this agreement, where the mortgagee in its own office sells to itself without the presence of any other person, for an arbitrary figure fixed by itself." In that case the amount for which the bank attempted to buy in the certificates, to wit, $16,000, was inadequate, for the bank had knowledge that the certificates would be redeemed for their face amount.   The court there undoubtedly took this fact into consideration.   However, it declared the sale invalid primarily because the private sale contemplated by the contract was not held where the mortgagee or pledgee " in its own office sells to itself, without the presence of any other person, for an arbitrary figure fixed by itself."

The defendants attempt to distinguish the four cases last cited on the ground that the sales were there declared invalid either because of the inadequacy of the consideration paid for the collateral or because of the fraud practiced by the pledgee.   While these elements may have been present, it clearly appears that the decisions in those cases were predicated chiefly on the fact that actual sales were not conducted as required by the terms of the contract (which permitted the pledgee to purchase at a public or private sale), and that the purported sales were a sham, resorted to for the purpose of simulating a sale in pretended compliance with the contract.

Defendants, in support of their contentions, rely principally on the following cases: *Matter of Mertens* (144 Fed. 818); *National Mill Supply Co.* v. *State* (*supra*), and *Colonial Trust Co.* v. *Central Trust Co.* (243 Penn. St. 268; 90 A. 189).   To these may be added *Frey* v. *Farmers & Mechanics Bank* (273 Mich. 284; 262 N. W. 911). In all of them the contracts contained provisions similar to the provisions in the contract here, that is, provisions giving the pledgee the right to sell the collateral at public or private sale, without notice, and to become the purchaser at such sale.   Superficially considered, the last two cases may appear to support the defendants' position, but upon a closer examination it will be found that none of these four cases authorizes the practice adopted by the trust company.   In none of them did the court hold that the pledgee may, without notice to the pledgor of the time and place

of sale, effect a private sale to himself by means of book entries — the practice resorted to by the trust company.

Thus, in *Matter of Mertens (supra)*, insurance policies were pledged as collateral. After a petition in bankruptcy had been filed against the pledgor, but before he was adjudicated a bankrupt and before a trustee was appointed, the pledgee " caused the policies to be sold by an auctioneer at a public salesroom," without notice. The pledgee bought in the policies, there being no other bids. The District Court held the sale was invalid because (1) it was not authorized by the terms of the pledge, and (2) the filing of the petition suspended the pledgee's rights under the contract. But the Circuit Court of Appeals took the contrary view and sustained the sale. Obviously, the public sale of this collateral by an auctioneer at a public salesroom is an actual sale at which competition, instead of being prevented or restricted, is permitted and encouraged. It cannot be compared with the acquisition of collateral by means of secret book entries. One is utterly different from the other.

In *National Mill Supply Co. v. State (supra)*, after a pledgee had purchased the collateral pursuant to the provisions of a contract authorizing it to do so, the corporation refused to transfer the securities so purchased to the name of the pledgee. The ground for this refusal was that the pledgee had failed to acquire a good title to the securities because the provisions of the contract authorizing the pledgee to sell the collateral at public or private sale, without notice, and to become the purchaser, were against public policy. The manner in which the pledgee conducted the sale at which it became the purchaser is not stated in the opinion, nor was any question raised concerning the conduct of such sale. The court merely decided that the provisions of the contract were not unlawful and were not against public policy. That was the only point raised. The court did not touch upon the right of the pledgee to effect a private sale to itself, without notice of the time and place of sale, by means of book entries.

In *Colonial Trust Co. v. Central Trust Co. (supra)* the trustee in bankruptcy of the pledgor was notified both personally and by mail that the collateral would be sold the following day at a certain hour at the office of the pledgee. The trustee's only protest was that the collateral should be sold on the exchange or at some public place. On the following day the pledgee at its office auctioned the collateral off to itself for a sum equal to the amount of the debt. No other bid was received. The court held the sale was valid. The material points of difference between that case and the one at bar are that there (1) the pledgor or his trustee was given notice

in advance of the exact time and place of the sale and had some opportunity either to bid himself or to obtain other bidders; (2) the pledgee went through the formalities of a sale, and the pledgor, having notice of the sale, it was incumbent upon him either to obtain other bidders, to ask for an adjournment of the sale, or otherwise protect his equity at the sale which was actually conducted; (3) instead of attempting to protect his equity, all that the pledgor — or, rather, his trustee — did was to protest that the collateral should be sold on the exchange or at a public sale; (4) no complaint was made either before or after the sale of the manner in which it was conducted; and (5) the court, therefore, concluded that the protest was ineffectual and could not deprive the pledgee of the right accorded to it by the contract to dispose of the collateral at a private sale.

Obviously, in the case at bar the secret manner in which the transfer of the collateral was effected and the absence of all formalities of a sale precluded the possibility of receiving other bids or of obtaining a better price, and prevented the pledgor from protecting his collateral. At the first opportunity the pledgor here objected, not because the pledgee failed to sell the securities on the exchange or at public sale, but because no sale whatever was held. In view of the facts in the Pennsylvania case, it is clear that the court there did not pass upon the right of a pledgee to effect a sale of collateral to itself, without notice, by means of book entries.

In *Frey* v. *Farmers & Mechanics Bank* (*supra*) the pledgee gave the pledgors twenty days' notice that the collateral would be sold to the highest bidder at the office of the pledgee at a date and hour specified in the notice. The Michigan statute requires a notice of at least ten days. Neither the pledgors nor any other bidders appeared. The pledgee made a notation in its records that it had purchased the collateral for the amount of the indebtedness. The Michigan court sustained the sale, saying: " The plaintiffs, although duly notified of the time and place of the sale, did not appear, nor did they apparently make any effort to secure the attendance of a bidder thereat. When the time for the sale arrived there was no one present except the officials of the defendant [the pledgee]. It would have been but an idle ceremony for them to have publicly announced that the sale was open and to have invited bidders for the security. They simply entered in their records the fact·that defendant became the purchaser at the amount due on plaintiffs' note." There the transfer was made openly, upon notice to the pledgors; the pledgors had ample opportunity to protect their collateral; they could have obtained other bidders. As they failed, after due opportunity, to protect themselves, it

may be that the pledgee was justified in taking over the collateral by means of the book entries. Here, on the contrary, the transfer was made secretly; the pledgor was given no notice of the time and place of the proposed sale; he was deprived of every opportunity of obtaining other bidders or of protecting his collateral. In other words, the trust company, by dispensing with notice of the time and place of the proposed sale, as it had a right to do under the contract, and thus preventing the pledgor from protecting himself, obligated itself as a trustee to protect the pledgor by making every reasonable endeavor to obtain other bids and to realize the highest price possible at the private sale which it claims to have held pursuant to the terms of the contract. Clearly, this obligation it failed to fulfill when all that it did was to secretly transfer the securities to itself by mere book entries. And this is so even if it be assumed that it credited the pledgor with the market price of the securities, for, as pointed out above, the market price is not necessarily the highest price obtainable at a private sale.

The difference between the Michigan case and the one at bar is simply this: There the absence of other bidders, which would make the sale an ordinary private sale, was due to the fault of the pledgors. Here, the absence of other bidders was due to the fault of the pledgee. As I have already stated, when a pledgee undertakes to conduct a private sale without notice to the pledgor of the time and place of sale, he must conduct a private sale as a private sale is ordinarily conducted, that is, by endeavoring to obtain other bids and selling to the highest bidder. Only in this way may the pledgee discharge his fiduciary obligation to the pledgor of realizing as much as possible upon the collateral.

Accepting, as we must, the truth of the allegations of the first cause of action, we may summarize as follows the facts and the legal conclusions:

The trust company, without notice to the pledgor, obtained title to the collateral by mere book entries. It made no effort to secure other bids; it made no attempt to obtain a better price. It failed completely; due to no fault of the pledgor, *first*, in fulfilling its duty of holding the private sale contemplated by the contract, and, *second*, in discharging its duty, as a trustee, of endeavoring to realize as much as possible on the collateral.

Therefore, the first cause of action is sufficient on its face, and the motion to dismiss it is denied, with ten dollars costs.