432 P.2d 446

**T. Ed PETERSON, Jr. and Nada Peterson, his wife, and H. H. Robinson and Carolyn H. Robinson, his wife, co-partners, doing business under the name and style of Peterson & Robinson Cotton Co., Appellants,**

v.

**The VALLEY NATIONAL BANK OF PHOENIX, a national banking association, Appellee.**

**No. 8328.**

Supreme Court of Arizona.

In Division.

Sept. 29, 1967.

D. Kelly Turner, Saipan, Mariana Islands, Lewis B. Moore, Jr., Scottsdale, for appellants.

Rawlins, Ellis, Burrus & Kiewit, Phoenix, for appellee.

LOCKWOOD, Justice:

This is an appeal from a judgment of the Superior Court, Maricopa County, in favor of the appellee, the Valley National Bank, the plaintiff below in an action to recover deficiencies due on eleven promissory notes given by appellants to the Bank. The appellants, T. Ed Peterson, Jr. and wife, and H. H. Robinson and wife,

were co-partners, doing business under the name of the Peterson and Robinson Cotton Company. The notes in question were signed by the partnership in connection with a line of credit extended to it by the Bank, the partnership using the credit extended to help it engage in the cotton business.

This Court had previously reversed a summary judgment which had been granted in favor of the plaintiff, Bank, holding in Peterson v. Valley National Bank of Phoenix, 90 Ariz. 361, 368 P.2d 317 (1962) that a trial must be held in this action since material issues of fact had been raised by the pleadings. Trial by a jury was waived by both parties, and after the cause was tried before the court, a judgment was entered October 23, 1963, in favor of the Bank, in the amount of $52,280.16 plus interest at the rate of 8% from May 1, 1959, and attorney's fees.

In 1953, the Bank granted the defendant partnership a line of credit to help finance its cotton business. The line of credit provided that any outstanding indebtedness owed the Bank by the partnership was to be evidenced by promissory notes payable on demand, drawing interest at 5¼%, the interest to be paid monthly. It was agreed that the line of credit was to run for one year, and would expire on each July 31, at which time appellant's account was to be paid in full, and a new credit line applied for the following year. To secure this indebtedness, a pledge agreement was executed on January 8, 1953 between the parties, pledging to the Bank as collateral all cotton purchased by appellants, with the Bank holding all of the warehouse or gin yard receipts representing the cotton, and setting the extent of collateral to be maintained by the partnership at an amount equal in value to 115% of the outstanding indebtedness. The pledge agreement also granted a power of sale to the Bank, to apply to all collateral held by it, and further provided that the Bank had the power:

"* * * to sell, without any previous demand, or demand of performance,

upon the undersigned, and with or without notice to the undersigned, as its option, the whole or any part of said securities, either at public or private sale, or at broker's board, at its discretion and without any advertisement or notice of sale, and to deliver the same to the purchaser thereof; * * *."

and further provided:

"After deducting all legal and other costs, expenses, and charges, including attorney's fee, incurred in the collection, sale, delivery, or in the preservation of said property, or any part thereof, said Bank, or its assigns, shall apply the residue of the proceeds of such sale to the payment of all the aforesaid indebtedness and the interest thereon; * * *."

After 1953, the partnership was granted a new line of credit each year until July 31, 1958.

Appellants followed the procedure of depositing proceeds from the sale of cotton in the partnership's checking account with the Bank. When the appellants wanted to purchase cotton, and its account did not have sufficient funds, Robinson executed and delivered a promissory note to the Bank on behalf of the partnership, in exchange for a credit to the partnership's checking account equal to the amount loaned. The line of credit was similarly used by appellants to pay various charges in connection with this account, such as interest, bank charges, and storage and insurance costs.

On August 1, 1958, the day after the partnership's yearly credit line had expired, the partners owed the Bank $255,114.56 on outstanding promissory notes, secured by 1,525 bales of cotton, valued by the Bank at $276,482.56. By the Bank's method of valuation, the margin was $17,000 short of the required amount. The Bank then requested the appellant partnership to increase its margin and liquidate their cotton account, and in response the partners started selling their cotton. However, by September 22, 1958,

the appellants still owed $255,553.96 to the Bank, and were approximately $55,000 deficient as to their margin. The Bank again requested additional margin, but was informed that the partners had no way of meeting the margin call. A deposit of $8,400 was the sole amount credited to the partnership's account during this period.

On September 29, 1958, the Bank wrote appellants that the line of credit had expired and that "we expect complete liquidation of your indebtedness to us not later than sixty days from date." Peterson and Robinson continued the sale of cotton, and proceeds from such sales were collected by the Bank and applied to the partnership's debt. On November 28, 1958, the appellants still owed the Bank $118,360.34, and 447 bales of cotton remained as collateral. An extension of time was granted by the Bank until January 15, 1959 to sell the remaining cotton, but the partnership was told that any cotton remaining unsold after that date would be taken over by the Bank and sold pursuant to the pledge agreement, and that they would be expected to pay any balance remaining. The remaining cotton was not sold, and on January 27, 1959, the appellants were notified that the Bank would proceed to sell the cotton without further notice to the partnership.

The Bank then took control over the cotton, and instructed Barnwell and Hayes, a cotton brokerage firm located in Memphis, Tennessee to display the cotton, contact other people in the trade about selling it, pick a favorable time for holding a sale, and take sealed bids on the entire lot and deliver the bids to the First National Bank of Memphis. On March 17, 1959, a sale of cotton was conducted, after the Bank was notified of the two bids received, and accepted the highest bid of thirty-one cents per pound.

The Bank later notified appellants of the sale and credited the proceeds on one of appellants' notes then due. A deficiency still existed, and the Bank brought suit for this amount, as evidenced by eleven prom-

issory notes, after the appellants refused to pay any further sums claiming that the price received at the sale was inadequate.

Appellants' first contention is that the trial court erred in finding that the demand for payment of the promissory notes had been made by the Bank in its letter of September 29, 1958, requesting complete liquidation of appellants' indebtedness within sixty days. It is not disputed that the notes were demand notes, but appellants contend that the letter was not sufficient to mature the notes since first the letter mentions indebtedness and not the notes themselves, and second, that seven of the notes involved in the suit were signed after the date of the Bank's letter.

■ When the demand for payment was effectively made is significant, since under the terms of the pledge agreement, nonpayment of either principal or interest due on the notes secured by the collateral allowed the Bank to resort to the power of sale in the pledge agreement, and sell the cotton pledged as collateral. As a general rule, notes payable on demand are due and payable immediately after execution, and no further demand is necessary to mature them. But an exception to this rule applies when the terms of the instrument disclose an intention by the parties that the notes would not become due and payable immediately after the time of delivery. Bank of Nevada v. United States, 251 F.2d 820 (9th Cir. 1957), cert. den. 356 U.S. 938, 78 S.Ct. 780, 2 L.Ed.2d 813; Blick v. Cockins, 131 Md. 625, 102 A. 1022 (1917). In such circumstances, an actual demand is necessary to mature the promissory notes. The terms of the notes in the present case provided one interest rate from the date of execution until maturity, and a higher rate of interest after maturity. This discloses a clear intention by the parties that the notes not be due and payable immediately. To hold otherwise would be inconsistent with the express terms of the note, and render these provisions meaningless.

■ We believe however, that an actual demand was made by the Bank as to the notes, and that the demand notes were mature before the March 17, 1959, sale of the pledged cotton. The Bank's letter in September 1958, calling for complete liquidation of appellant's indebtedness was sufficient to constitute a demand for payment of the promissory notes, as the notes were the primary evidence of the indebtedness owed the Bank. The appellants' line of credit had previously expired, so it was clear that this letter from the Bank was notice to appellants that payment was due, and gave them sixty days in which to sell the cotton and make such payment.

■ The fact that seven of the notes were signed after the Bank's first letter demanding payment does not show that no demand was made as to these notes. The notes were all executed on or before January 5, 1959. On December 8, 1958, the Bank had granted appellants an extension until January 15, 1959 to sell their cotton, but had notified them that if the collateral was not sold by that time, the Bank would take over the security and hold the appellants responsible for the deficiency. The partners failed to sell the cotton and pay off their indebtedness, and so on January 27, 1959, the Bank notified them by letter that it was proceeding pursuant to the pledge agreement to sell the cotton without further notice or demand. Thus, whether the demand in September 1958, made the seven notes in question due and payable when they were issued is immaterial, since the letter of January 27, 1959 clearly did so. Furthermore, the record discloses that these notes were not evidence of a new independent line of credit extended to appellants, but rather were issued to protect the Bank's interest in the pledged goods and loans already made. The notes evidenced loans made to pay freight charges in connection with selling the cotton, interest charges, overdrafts, and to pay for the return of fourteen bales of cotton which were rejected after being sold by the partnership.

■ The Bank was then justified in proceeding with the sale of the pledged

goods, as proper demand had been made to make the demand notes due and payable, and the appellants' indebtedness was not extinguished. The fact that the Bank treated interest as being paid on the notes until May 1, 1959, a date subsequent to the sale, does not require a holding that the notes were not due and in default at an earlier date. The failure by appellants to pay their indebtedness after repeated demand fully justified a finding that the principal amounts of the notes were in default before the sale of the pledged goods, irrespective of how interest payments were credited on the Bank's books.

Appellants next contend that the Bank, by its conduct, had waived its power under the pledge agreement, to sell the pledged cotton at a private sale without notice to the pledgor. The appellants claimed that when the bank sold the cotton, after first granting extensions of time, and failed to first notify Robinson of offers received, this amounted to a forfeiture of appellants' interest in the pledged goods without proper notice to reinstate this provision of the pledge agreement.

 · The Bank's right to sell the pledged cotton without notice, as expressed in the pledge agreement, could be waived by the acts or conduct of the pledgee-Bank. Wade v. Markwell & Co., 118 Cal.App.2d 410, 258 P.2d 497, 37 A.L.R.2d 1363 (1953); Toplitz v. Bauer, 161 N.Y. 325, 55 N.E. 1059 (1900); 72 C.J.S. Pledges § 59, p. 121.

When the Bank granted the previously mentioned extension until January 15, 1959, appellants were specifically told by the Bank's attorney that any cotton remaining unsold on that date would be taken over and sold by the Bank. Then on January 27, 1959, after no sales had been made, the Bank again notified them that it would proceed to sell the cotton without further notice.

 The Bank could not have sold the cotton during the time extended to appellants, and to this extent the Bank waived strict compliance with the terms of the pledge agreement. However, the appellants were on notice that the cotton would be sold after the extension period expired, and nearly two months passed before the actual sale was made, certainly a reasonable time period for appellants to sell their cotton and redeem the pledged goods.

 The appellants claim that one of the Bank's officials promised Robinson he would be notified of any offers the Bank received. The records show that this was denied by the Bank officials, so we cannot overturn the trial court's finding that no such agreement existed, there being sufficient evidence to support the finding. A sale of fifty bales of cotton by the appellants on March 5, 1959 in Breman, Germany, the proceeds of which were accepted by the Bank, is also relied on as conduct showing waiver. This cotton was part of a prior consignment sent to Germany, on which an earlier sale had fallen through. The Bank no. longer exercised any control over this particular cotton as collateral, and merely accepting the proceeds did not waive the power of sale over the cotton it did control. Accordingly, we find that the conduct of the Bank during this period did not require any further notification on its part before selling the collateral.

The appellants further claim that the trial court committed error in finding that the pledgee sold the collateral security at a private sale rather than a public one. They argue that the Bank had chosen to sell at a public auction rather than a sale by "private negotiation", but had failed to meet the statutory requirements of a public sale.

 Where the pledge agreement permitted either a public sale or private sale of the collateral pledged, as here, the Bank could not attempt a public sale of the cotton without conforming with statutory requirements for sale of such goods. United Bank & Trust v. Jones, 30 Ariz. 557, 249 P. 747 (1926). These requirements are set out in A.R.S. § 33–791, and the Bank's sale did not meet these public sale requirements, as no notice of the sale was given appellants before the sale was made. However, the statute does not forbid a private sale of the

pledged property without notice, if the parties so agree. Atlantic National Bank of Boston v. Korrick, 29 Ariz. 468, 242 P. 1009, 43 A.L.R. 1184 (1926).

 The sale here by the Bank was clearly not an attempt to conduct a public sale of the pledged property. The most essential element of such a sale is that notice be given to the general public, so that they will be invited to attend and bid. Huntingdon Valley Trust Co. v. Norristown-Penn Trust Co., 329 Pa. 356, 196 A. 821 (1938); In re Nevada-Utah Mines & Smelters Corporation, 202 F. 126 (2nd Cir. 1913). Here, the brokerage firm in Memphis notified only persons in the cotton trade who might be interested in purchasing the cotton. No attempt was made to advertise a sale through the newspapers, or to hold the sale in a public place, but rather sealed bids were required, which were opened in private offices, with no members of the public present. There was no attempt to hold a public auction, as contemplated by the statute.

 . If some notice of a sale is given, however, and bids are accepted, it does not automatically prevent the resulting sale from being a private one. An actual sale must take place, and must be conducted openly in order to be valid. Cole v. Manufacturers Trust Co., 164 Misc. 741, 299 N.Y.S. 418 (1937). To adopt the reasoning of the appellants here, a private sale would, by definition, take on the attributes of a secret or collusive transaction. We hold that the appellees actions were consistent with the conducting of a valid private sale and support the findings of the lower court on this issue.

The trial court also found that the Bank did not breach its fiduciary duty or act in bad faith either in conducting the sale of the cotton held as collateral, or in accepting the price received at the sale, finding such price to be fair and reasonable under the market conditions prevailing on the date of the sale, and that the Bank believed it was receiving the largest amount obtainable for the cotton. The appellants attack these findings, urging that the Bank did not act in good faith in both carrying out the sale and accepting thirty-one cents per pound as the sale price.

 The pledgee definitely had a duty to act in good faith and with reasonable skill and diligence when it exercised its power of sale under the pledge agreement. But when the pledgor questions such good faith, the burden is on the pledgor to establish their contentions. Atlantic National Bank of Boston v. Korrick, supra. This the appellants have failed to do. The record is consistent with a finding that the Bank acted fairly and reasonably in conducting the sale, and with no collusion on its part with any other party. In fact, the appellants admit there was no collusion here, but vaguely refer to "strange" circumstances touching the sale.

 We have established that it was not necessary for the Bank to notify appellants of the sale. Memphis was chosen because of its reputation as being one of the best locations in the country to sell smaller amounts of cotton. The appellants knew the sale was to take place there, so no secrecy was involved. An experienced brokerage firm was retained to sell the cotton. Notice was given to people in the trade of the availability of the cotton for sale, and samples were displayed in the offices of the cotton brokers. The fact many of the samples were low grade was justified since much of the cotton was of low quality. The method of accepting sealed bids was also used by the United States government in selling its cotton, and helped the Bank preserve a record of the sale. Bad faith on the Bank's part in conducting the sale cannot be inferred from these facts.

The appellants also contend that it was reversible error for the trial court to exclude evidence offered by appellants as to the value of the cotton at the time of the sale. These offers included evidence of the original cost of the cotton to the partnership, prior sales by the partnership, and purchase offers by third parties near the

date of the sale. Appellants sought to show that the actual value of the pledged goods was much higher than the price obtained by the Bank, and thus the Bank did not accept a fair and reasonable price for the collateral.

The evidence offered to prove valuation was properly excluded. The purchase price originally paid by the partnership was no longer relevant as to the value on the date of the sale, since it was purchased at least two years earlier, and fluctuations of the market price had occurred in the meantime. The question of whether such evidence is too remote in point of time is within the discretion of the trial court. Salter v. Leventhal, 337 Mass. 679, 151 N.E.2d 275 (1958); San Antonio Public Service Co. v. Murray, 59 S.W.2d 851 (Tex.Civ.App.1933). The same reasoning applies to the prior sales, as they took place over a year before the March 17 sale.

The offers to purchase from third parties are properly excluded since offers to buy or sell personal property at a certain price are not admissible to prove the value of the property. Udall, Arizona Law of Evidence, § 120, p. 255. Stone v. Payne, 168 S.W.2d 503 (Tex.Civ.App.1943). As stated in Atlantic National Bank of Boston v. Korrick, supra, market value is determined by actual sales.

There is every indication that the pledged cotton was sold by the Bank at a fair price, and not so inadequate as to suggest a fraudulent purpose. The Bank had previously estimated that the government loan price was close to the final sale price, the market for this type of cotton had been quite low, and a large amount of the cotton was of a very low grade. It was not shown that there were any other sales of this type of cotton near the date of the Bank's sale, and the Bank only accepted a bid after consulting with its agents in Memphis. Thus, the appellants have also failed to meet their burden of contesting the fairness of the price received by the Bank.

Finally, the appellants argue that when their answer to the Bank's complaint claimed offsetting credits, the action became one for an unliquidated claim, and interest should only have been allowed the Bank from the date of the judgment, and not from May 1, 1959. The promissory notes in question here provided that unpaid principal shall draw interest at the rate of 8% per annum from maturity until paid. A.R.S. § 44–1201 provides that a judgment entered on an agreement signed by the debtor providing for a rate of interest, not to exceed 8% per annum, shall include the agreed rate of interest. The notes here provided for 8% per year from the date of maturity until paid, so the judgment could include interest from that date rather than the date of judgment. The sum sought by the Bank here was of a liquidated claim, based on the promissory notes, and readily ascertainable. The claimed offset by appellants did not change its nature. Further, the appellants did not object to the item of interest included in the judgment, before it was signed in the lower court, so they cannot object to it on appeal. Southwest Mines Development Company v. Martignene, 49 Ariz. 88, 64 P.2d 1031 (1937).

Since we have found no reversible error in the trial court's findings of fact and conclusions of law, the judgment of the Superior Court is affirmed.

BERNSTEIN, C. J., and STRUCKMEYER, J., concur.